Ernest Lee **MANERY**, Appellant

v.

**COMMONWEALTH of Kentucky,**
**Appellee**

2014–SC–000666–MR

Supreme Court of Kentucky.

RENDERED: JUNE 16, 2016

COUNSEL FOR APPELLANT: Emily Holt Rhorer, Assistant Public Advocate

COUNSEL FOR APPELLEE: Andy Beshear, Attorney General of Kentucky, Thomas Allen Van De Rostyne, Assistant Attorney General of Kentucky

## OPINION OF THE COURT BY CHIEF JUSTICE MINTON

A circuit court jury convicted Ernest Lee Manery on multiple counts of first-degree rape, first-degree sexual abuse, and being a first-degree persistent felony offender (PFO), for which he was sentenced to prison for life without the possibility of parole for twenty-five years. Manery's leading argument in this matter-of-right appeal[1] is that the trial court violated his constitutional right to confront witnesses against him by allowing the Common-wealth to introduce incriminating forensic test results at trial through the testimony of an expert witness under a hearsay exception rather than through live testimony from the technician who conducted the test. We agree with Manery on this issue, reverse the judgment, and remand the case to the trial court for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

Manery was in a romantic relationship with Sarah Spicer, and they lived together with Sarah's parents, Donald and Patricia Spicer. Other occupants of the Spicers' residence included a number of Sarah's family members and acquaintances, including Sarah's ten year-old daughter, Jane.[2] Patricia had custody of Jane since her birth, because Jane was born with mari-

---

1. Ky. Const. § 110(b).

2. *Jane* is a pseudonym.

juana in her system. While Manery was staying at the Spicer residence, Sarah was arrested again and taken to rehab. Manery continued to stay at the Spicer residence, paying them rent. Manery and Jane were said to be close, and Jane often slept in Manery's bed while Manery slept in a chair in the room.

Patricia took Jane to the pediatrician after Jane complained of a burning sensation when she went to the bathroom and "sticky stuff" in her panties. After being referred to a children's hospital for additional examination, Patricia was informed that Jane had gonorrhea, a sexually transmitted disease. Gonorrhea is a rare occurrence in children, even among those sexually abused. A physical examination revealed, aside from the previously mentioned symptoms, no bruising or tearing; everything was relatively normal except for redness and vulvavaginitis—a result of the vaginal discharge. After this discovery, Patricia confronted Jane, who told her that Manery had done something to her.

In total, Jane claimed there were three separate instances when Manery raped her. All three occurred in the Spicer home, and all three took place in Manery's bedroom. The first occurred one night when Jane's great-grandmother was snoring—the two shared a bedroom—and Jane went to Manery's room to watch television. He entered the room and silently removed her clothes. He rubbed his hands between her legs, then removed his pants and put "his private in her private." Jane claimed this hurt, but Manery did not stop. Once

he finished, he instructed Jane to never tell anyone because "her mother would hate her."

The second alleged contact occurred under similar circumstances—Jane was initially alone in Manery's room watching television. And again she claims he removed her clothes, put his penis into her vagina, and rubbed his hand over her buttocks. But this time, Manery did not warn her to keep quiet; the two departed in silence shortly after the deed was done.

The third instance began when Manery was playing with Jane and her cousin, Mary.[3] Manery was giving both girls piggyback rides, but eventually Jane's ride took her back to Manery's bedroom.[4] He again silently removed her clothing, rubbed her vagina with his hands, placed his penis into her vagina, and touched her buttocks with his hands. It was shortly after this encounter that Jane began experiencing the vaginal discomfort that led to the diagnosis for gonorrhea.

Not long after her formal diagnosis of gonorrhea, law enforcement contacted Manery. During his interview with the police, he vehemently denied any wrongdoing or any sexual contact with Jane. The police later executed a search warrant to test Manery for gonorrhea.[5] The test came back presumptively positive for gonorrhea and chlamydia.

The grand jury indicted Manery on three counts of first-degree rape, three counts of first-degree sodomy with a victim under the age of twelve, three counts of first-degree sexual abuse for victim under

3. *Mary* is a pseudonym.

4. It is not clear what happened to Mary as this was developing, but at trial, Jane believes Mary simply went downstairs when Manery moved toward his bedroom.

5. It should be noted that Manery is the only individual that was tested for STD in this

case. Manery makes multiple references to "Rick," another former resident at the Spicer home of questionable character, as a potential alternate perpetrator. But because none of the issues we tackle today directly relate to any third-party theory, we will not consider any "Rick" theories in our analysis.

the age of twelve, failure to comply with sex offender registry, and of being a second-degree PFO. Pending trial, the grand jury returned another indictment that charged Manery with being a first-degree PFO.

At trial, the trial court granted the Commonwealth's motion to dismiss two counts from the original indictment: failure to register with the sex offender registry and second-degree PFO. The trial court also directed a verdict in Manery's favor on all three sodomy charges. The jury convicted him of all three counts of rape, all three counts of sexual abuse, and of being a first-degree PFO, recommending a sentence of life without the possibility of parole for twenty-five years for the PFO-enhanced rape charges and ten years' imprisonment for the PFO-enhanced sexual abuse charges, to be served concurrently. At final sentencing, the trial court noted Manery's extensive criminal history,[6] and entered final judgment imposing an effective sentence of imprisonment for life without the possibility of parole for twenty-five years.

## II. ANALYSIS.

On appeal, Manery argues four trial errors require reversal of the judgment: (1) his Sixth Amendment rights under the Confrontation Clause were violated; (2) the forensic test to detect gonorrhea was only presumptively positive and should have been excluded from evidence; (3) the jury should not have been instructed on first-degree PFO; and (4) the jury instructions denied him a unanimous verdict. We will address each issue in turn.

### A. The Confrontation Clause.

Manery contends that his rights under the Confrontation Clause were violated when evidence of his forensic test results was introduced through a hearsay exception rather than from live testimony from the technician at Quest Diagnostics, Inc., the firm that conducted the test. Law enforcement executed a search warrant to force Manery to submit to a DNA penile swab to test him for sexually transmitted diseases relevant to Jane's rape claims. The swab was then sent to Quest, where Kim Dickson performed the lab analysis that linked Manery's swab to gonorrhea. But Dickson did not testify at trial.

Instead, the Commonwealth chose to introduce the lab-result evidence through testimony from the jail's medical doctor, Dr. Kalfas. The results were introduced through the medical-records hearsay exception, with Dr. Kalfas serving as the sponsor for laying the foundation for their admissibility into evidence.

Dr. Kalfas had never examined Manery, never reviewed his medical records, and never met him before testifying. He merely testified that he ordered a DNA swab in relation to the search warrant, and after receiving the results from Quest, began eradicating the organisms consistent with gonorrhea in Manery's system.[7]

Manery objected at trial that the Confrontation Clause required testimony from the Quest lab specialist who conducted the test, which the trial court overruled. On review, we analyze evidentiary rulings for abuse of discretion. So we will not disturb

6. In 1981, he was convicted in Ohio of rape and burglary. In 2006, he pleaded guilty to first-degree trafficking in a controlled substance in Kentucky.

7. Manery was never formally diagnosed with gonorrhea. The Quest results were only presumptive positives, detecting organisms consistent with the disease. So Dr. Kalfas never "treated" him for the STD but was only "eradicating organisms," which is his rationale for not ordering further testing formally to diagnose Manery with gonorrhea.

the trial court's ruling absent a finding that the decision was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[8]

■ The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "in all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."[9] The Due Process Clause of the Fourteenth Amendment incorporates this right to state proceedings in addition to federal prosecutions.[10] And this right is further protected in Section 11 of the Kentucky Constitution.[11] Despite noteworthy textual differences, we have not yet held that Section 11 is to be construed more strictly than its Sixth Amendment counterpart.[12]

In recent history, the United States Supreme Court's construction of the Confrontation Clause has undergone a dramatic makeover. The old rule, as exemplified by *Ohio v. Roberts,* allowed third-party admission of out-of-court testimony if the evidence bore "adequate indicia of reliability."[13] When a witness against the accused is unavailable for live testimony, the Court ruled that the Constitution allowed the testimony through either a "firmly rooted hearsay exception" in the rules of evidence, or if the testimony contained "particularized guarantees of trustworthiness."[14] The old rule thus construed basic evidentiary practices as satisfactory for Confrontation Clause purposes.

But in *Crawford v. Washington,* the Court rejected the *Ohio v. Roberts* position.[15] Under the *Crawford* rule, "the inquiry is not whether hearsay falls under a deeply rooted exception or has particularized guarantees of trustworthiness; rather, the inquiry is whether the out-of-court statement is 'testimonial' and whether the defendant had an opportunity to cross-examine the statement when it was made."[16] So *Crawford* introduced a more searching inquiry than the traditional standard—non-testimonial statements may still be examined for reliability, but *testimonial* out-of-court statements from unavailable witnesses are categorically barred from admission under the Constitution unless

---

**8.** *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky.1999).

**9.** U.S. Const. amend VI.

**10.** *See Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

**11.** "In all criminal prosecutions the accused has the right ... to meet the witnesses face to face, and to have compulsory process for obtaining witnesses in his favor."

**12.** *See Commonwealth v. Willis,* 716 S.W.2d 224, 229 (Ky.1986) ("There is no authority to support the proposition that the right of confrontation guaranteed by the Kentucky Constitution should be construed more stringently than the same right in the United States Constitution."). But this decision came nearly two decades before the United States Supreme Court articulated a new Confrontation Clause standard in *Crawford v. Washington,*

541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Because today's decision does not require us to go beyond *Crawford's* protections, we see no reason to revisit our holding in *Willis.*

**13.** *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).

**14.** *Id.*

**15.** *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

**16.** Robert G. Lawson, The Kentucky Evidence Law Handbook § 11.30(4)(c) (5th ed.2013). *See also Crawford,* 541 U.S. at 53–54, 124 S.Ct. 1354 ("... the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.").

the defendant had an opportunity for cross-examination.

■■■ It is uncontested that Manery has not been afforded the opportunity to cross-examine the Quest lab analyst who tested his DNA swab. The essential question for his case is whether the results of this test are "testimonial" evidence against him. In *Davis v. Washington*, a follow-up to *Crawford*, the Supreme Court presented an explanation of testimonial and non-testimonial evidence for Confrontation Clause purposes.[17] A statement is not testimonial, the Court held, if it is "made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency."[18] But a statement is testimonial if "the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose ... is to establish or prove past events potentially relevant to later criminal prosecution."[19] So essentially, after *Davis* the question of whether evidence is testimonial in nature depends on the purpose for which it was created—and the strictures of the Confrontation Clause must apply to statements, the purpose of which is to incriminate the defendant.

The Supreme Court has also tackled the application of the Confrontation Clause to

forensic analysis, delineating the distinction between testimonial medical records and those intended for medical treatment. In *Melendez–Diaz v. Massachusetts*, the Court held that forensic reports prepared for trial are testimonial, but "medical reports created for treatment purposes" are "not testimonial under our decision today."[20] Justice Sotomayor has attempted to further clarify this ruling, writing that when determining whether a forensic report is testimonial, the critical inquiry is whether it "has a 'primary purpose of creating an out-of-court substitute for trial testimony.'"[21] Absent that primary purpose, the Confrontation Clause does not affect the admissibility of the report.[22]

We faced a similar issue recently. In *Little v. Commonwealth*, the defendant objected to the admission of a laboratory report introduced when he arrived at the hospital for treatment following an automobile accident, for which he was accused of operating the vehicle under the influence of alcohol.[23] Relying on the same Supreme Court precedent referenced above, we held that admission of this report did not implicate the Confrontation Clause. We determined that the "comprehensive blood analysis report was clearly intended for the primary purpose of providing that medical treatment" and "was

17. 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).

18. *Id.* at 822, 126 S.Ct. 2266.

19. *Id.*

20. 557 U.S. 305, 362, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009).

21. *Bullcoming v. New Mexico*, 564 U.S. 647, 669, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011) (Sotomayor, J., concurring) (quoting *Michigan v. Bryant*, 562 U.S. 344, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011)).

22. *Id. See also Williams v. Illinois*, —— U.S. ——, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012). Justice Alito, writing for a plurality of the Court, touches on a similar consideration. Introduction of lab reports does not run afoul of the Confrontation Clause in such situations where the test was not primarily conducted to inculpate the defendant, who, at the time, was "neither in custody nor under suspicion." *Id.* at 2243. According to Justice Alito, the lab technician could not have possibly known, at the time, that the profile would inculpate the defendant." *Id.* at 2243–44.

23. 422 S.W.3d 238 (Ky.2013).

not intended to establish or prove a fact or serve as a 'substitute for trial testimony.' "[24]

But in Manery's case we find a critical factual difference from *Little* : the DNA swab was conducted under execution of a search warrant. Indeed, Manery was only swabbed because he was suspected of performing illegal sexual acts on Jane. The only reason for testing Manery was to connect him with a crime; and there was admittedly no medical purpose to the test. Jane had accused him of a sexual contact that led to her contracting gonorrhea. The forensic testing was requested by law enforcement to substantiate those accusations. When the analyst at Quest conducted the test, any positive results for gonorrhea would doubtlessly inculpate Manery with the crimes alleged by Jane, and there was no broader purpose beyond identifying the perpetrator of these sex crimes. So we have no doubt that the report in this case is properly considered testimonial for purposes of the Confrontation Clause.

In response to the confrontation issue, the Commonwealth essentially takes the position that the rules of evidence allow admission of this testimony through other means.[25] But this argument misses the mark. As useful as the rules of evidence are, the Confrontation Clause, as a constitutional right, is "the supreme Law of the Land."[26] Once we determine that the out-of-court information is testimonial and that Manery never had the opportunity for cross-examination, there is nothing the rules of evidence can do to circumvent the constitutional imperative. We see no reason to grant a specific exception or to allow the Commonwealth to bootstrap unconstitutional evidence when the Constitution presents such an unequivocal command.

The crimes committed against Jane are reprehensible, and justice demands that the perpetrator be fully prosecuted and rightly punished. But our Constitution instructs us how justice is obtained. Due process of law extends to those accused of even unspeakable crimes. And that is no different in this case.

The Quest lab specialist who conducted the test did not testify at trial. The issue of unavailability aside, the record seems clear that Manery never had the opportunity to cross-examine the author of the report connecting his penile-swab sample with organisms consistent with gonorrhea. We therefore are constrained to hold that his right to confrontation of witnesses against Manery under the Sixth Amendment and Section 11 of the Kentucky Constitution was violated when the Commonwealth admitted the Quest report into evidence through a hearsay exception. Accordingly, we reverse the judgment and remand for further proceedings consistent with this opinion.

We now review Manery's remaining allegations of error for mistakes capable of repetition in the event of retrial.

**B. The Trial Court Did Not Err in Admitting the Presumptive Positive Test.**

---

**24.** *Id.* at 246. In passing, the *Little* opinion also made note that the Kentucky State Police executed a search warrant for Little's blood after the accident to obtain a toxicology report. Because the KSP admitted the report through the author's testimony, there was no confrontation issue for this specific evidence—evidence that directly parallels the issue Manery brings to this Court today.

**25.** *See Williams* at 2246 (that experts may rely on otherwise inadmissible out-of-court statements as a basis for forming expert opinion if they are of a kind that experts in the field normally rely upon.)

**26.** U.S. Const. art. VI, cl. 2.

■ Manery contends that the trial court erroneously admitted into evidence testimony of the presumptive-positive report from Quest linking him to gonorrhea. Even assuming at a retrial that the Commonwealth introduces the findings of the DNA penile swab correctly through live testimony from the Quest lab specialist, Manery believes the rules of evidence bar admissibility altogether.

■ Unlike Jane, Manery was never formally diagnosed with gonorrhea. The Quest report simply discovered the presence of organisms consistent with gonorrhea. Manery essentially suggests the test may have been a false-positive, and admitting the test into evidence resulted in overwhelming prejudice to his defense at trial. We review appeals of evidentiary rulings for an abuse of discretion, but we will not displace the trial court's decision absent a finding that admitting the evidence was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." [27]

At its core, this issue is about relevancy and the way the relevancy provisions of the Kentucky Rules of Evidence (KRE) address questionably reliable evidence. KRE 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." To us, there is no doubt that the Quest findings are relevant evidence. Jane, a prepubescent child, was diagnosed with a sexually transmitted disease, gonorrhea. Presumably, she con-

tracted the disease from the male who sexually abused her. So forensic proof linking Manery to gonorrhea most certainly raises an inference that he gave Jane the disease and, accordingly, tends to make it more probable that he is her abuser. The rules further articulate that all relevant evidence is admissible, absent an additional rule of law barring its admission.[28] As relevant evidence, we begin with the presumption that the Quest report is admissible.

But KRE 403 addresses the necessity for reliable evidence. The rule commands the reviewing trial judge to weigh the probative worth of proffered evidence against the risk of undue harm or prejudice as a result of admission. Specifically, the rule mandates that "Although relevant, evidence may be excluded if its probative value is *substantially outweighed* by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." [29] So the rules provide a mechanism for excluding certain evidence while simultaneously highlighting its favor toward relevant evidence, reflecting the general inclusive thrust in Kentucky evidence law. Consistent with those goals, the yardstick for the court to employ— whether the risk of harm substantially outweighs the probative worth—is a tall hurdle to overcome.

Manery uses his concerns of the reliability of the presumptive-positive test to attack both prongs of the KRA 403 analysis, urging us to find that the report was erro-

27. *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999).

28. *See* KRE 402 ("All relevant evidence is admissible, except as otherwise provided by the Constitutions of the United States and the Commonwealth of Kentucky, by Acts of the General Assembly of the Commonwealth of Kentucky, by these rules, or by other rules adopted by the Supreme Court of Kentucky. Evidence which is not relevant is not admissible.).

29. KRE 403 (emphasis added).

neously admitted. First, he contends that the report lacked probative worth because it cannot definitively state whether he actually had gonorrhea. This argument is bolstered by the fact that he was only tested the one time, and Dr. Kalfas testified that it would take more testing to diagnose Manery with the disease. And Manery cites other examples in Kentucky case law excluding other types of presumptive-positive results.[30] So, essentially, he argues that the risk of a false-positive from failing to diagnose him with gonorrhea erodes the value of this evidence in associating him with the sex crimes committed against Jane.

. Second, Manery relies on the negative consequences a false-positive may have on a juror's mind to underscore what he considers a great risk of harm to his defense in allowing this evidence to be presented to the jury. He seems implicitly to recognize that forensic results associating himself with the same sexually transmitted disease present in the underage victim would carry enormous weight in the jurors' minds. This is, in a sense, a tacit concession that this evidence is extremely valuable to the Commonwealth in obtaining a guilty verdict. But according to Manery, this impact on the jury is precisely why the evidence should be excluded. Because it would carry such weight, the prejudicial magnitude in admitting a false-positive would cripple his defense.

Manery argues his case well. But we simply cannot conclude the trial court abused its discretion in admitting the results. It would be better had Manery been subjected to additional testing to diagnose him formally with gonorrhea, and thus eliminate any doubt. But when this issue was presented at trial, the Commonwealth used testimony from medical doctors to minimize the suggested unreliability of this evidence. Doctors testified that the penile-swab test is the most frequently used and they considered the test an effective one. Additionally, this particular test is considered the most sensitive and most stable to transport for available use. Essentially, this testimony reflected the confidence with which medical professionals rely on the results.

As for any parallels to our prior rulings with regard to the admissibility of presumptive-positive results, there are meaningful distinctions separating our prior holdings from the case before us today. The primary example cited by Manery is our disfavor of presumptive testing for intoxicants, particularly the results of Portable Breathalyzer Tests (PBT). First and foremost, the legislature regulates and limits testing for crimes of intoxication.[31] More importantly, each type of forensic test carries its own methodology and its own processes in reaching a reliable result in addition to its own risks for error. But we do not have to be scientists to understand that some tests are more accurate than others. Attempting to equate the risks of admitting the results of a PBT to the result of a penile-swab DNA examination performed under laboratory settings would be akin to comparing chalk and cheese—though similar in appearance, there is a tremendous substantive difference.

Considering the supplemental testimony to the credibility of the test, we cannot find that the trial court abused its discretion in allowing testimony as to the results. Forensic evidence, so long as it may be rea-

**30.** *See Hoppenjans v. Commonwealth,* 299 S.W.3d 290 (Ky.App.2009). *See also Thacker v. Commonwealth,* 2003 WL 22227194 (Ky. 2003).

**31.** *See* KRS 189A. 104 (limiting proof in DUI to only specific types of substance testing).

sonably relied upon, is perhaps the best evidence available to the Commonwealth in this prosecution. We have not been briefed on any scientific evidence questioning the methodology of the penile-swab DNA test nor any data relating to the rate with which it yields a false positive. Instead, we are left only with the argument that it *might* have resulted in a false-positive—a concern implicit in every consideration of forensic evidence—coupled with the failure to conduct additional testing to reach a formal diagnosis of gonorrhea for Manery. While we encourage more definitive proof, we cannot say that admission of the presumptive-positive test alone is an abuse of judicial discretion.

### C. Prior Notice of the PFO I Charge.

Manery's third claim of error is that he was not given adequate notice that he would be charged with PFO I and subjected to the enhanced sentencing guidelines consistent with such a conviction. And he suggests that the jury should not have been instructed to this offense. Because we are remanding this case for further proceedings, analysis of this issue is unnecessary. We see no reason to address whether the trial court did or did not err in instructing the jury as a result of Manery's alleged lack of notice. In the event of retrial, surely Manery will now have adequate notice that he has been indicted as a first-degree persistent felony offender and can prepare his defense accordingly.

### D. Unanimous Verdict.

For his final issue on appeal, Manery contends that he was denied a unanimous verdict because the jury received multiple identical instructions. Specifically, he was charged with three counts of first-degree, rape and three counts of first-degree sexu-

al abuse. All three rape charges read as follows:

> You will find the Defendant, Ernest Lee Manery, guilty of **Rape in the First Degree** under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
>
> A. That in this county on or about a day or days in December 2012, and before the finding of the Indictment herein, he engaged in sexual intercourse with [Jane].; AND
>
> B. That at the time of such intercourse, [Jane] was less than twelve (12) years of age.

Likewise, all three instructions for sexual abuse provided:

> You will find the Defendant, Ernest Lee Manery, guilty of **Sexual Abuse in the First Degree** under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
>
> A. That in this county on or about a day or days in December, 2012, and before the finding of the Indictment herein, he subjected [Jane] to sexual contact; AND
>
> B. That at the time of such contact, [Jane] was less than twelve (12) years of age.

Manery was convicted of all six charges. Yet, he contends he was denied a unanimous verdict because the identical instructions did not factually differentiate between each specific act. This issue was not preserved below, and Manery asks us to conduct palpable-error review.[32]

---

**32.** RCr 10.26 ("A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.").

It is true that we have previously held that "when multiple offenses are charged in a single indictment, the Commonwealth must introduce evidence sufficient to prove each offense and to differentiate each count from the others, and the jury must be separately instructed on each charged offense."[33] But with this firmly in mind, jury instructions may sometimes be "an unfortunate, yet ultimately harmless error."[34] This is somewhat of a balancing act between Kentucky's avowed preference for the "bare bones" approach to jury instructions, and a defendant's unquestioned right to a unanimous verdict. Although repetitious jury instructions are presumed prejudicial, we will find harmless error when the Commonwealth can show "affirmatively that no prejudice resulted from the error."[35]

Because we reverse and remand on other grounds, there is no reason for us to review this claim for reversible or harmless error. For today, we are satisfied by simply stating that under our framework in *Harp v. Commonwealth*, these instructions were at least presumably prejudicial. It remains true that he was convicted on *all* counts—a potentially potent argument in curbing the prejudicial impact of the flawed instructions. But we are confident in the event of retrial that the trial court will not commit a similar error. So we decline a full review on the merits.

### III. CONCLUSION.

As despicable as are the crimes committed against Jane, the Constitution must be our guide. The Confrontation Clause grants a criminal defendant the right to confront witnesses bearing testimonial evidence against him, absent a prior opportunity for cross examination. Because the presumptive-positive results of the penile-swab examination is testimonial evidence, Manery was entitled to confront the lab analyst who conducted the test. So, we reverse his convictions and remand his case for further proceedings consistent with this opinion.

All sitting. All concur.

---

**33.** *Miller v. Commonwealth,* 77 S.W.3d 566, 576 (Ky.2002).

**34.** *Harp v. Commonwealth,* 266 S.W.3d 813, 818 (Ky.2008).

