# IMPORTANT NOTICE
# NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: FEBRUARY 15, 2018
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

FINAL

2016-SC-000486-MR DATE 3/8/18 Kim Redmon, DC

PARIS CHARLES      APPELLANT

V.      ON APPEAL FROM FAYETTE CIRCUIT COURT
HONORABLE JAMES D. ISHMAEL JR., JUDGE
NO. 15-CR-00261

COMMONWEALTH OF KENTUCKY      APPELLEE

## MEMORANDUM OPINION OF THE COURT

### AFFIRMING

A Fayette County jury found Appellant, Paris Charles (Charles), guilty of murder and abuse of a corpse. The jury recommended a sentence of 35 years for murder and 12 months for abuse of a corpse. The court imposed the jury's recommendation and sentenced Charles to 35 years to serve in prison. As a matter of right, Charles now challenges his conviction on several grounds: (1) the trial court erred in failing to instruct the jury on several lesser included offenses as Charles requested; (2) the Commonwealth should not have been permitted to admit evidence of "Bluestar" reactions and presumptive tests for the presence of blood at Charles's home; (3) the Commonwealth improperly

admitted expert evidence of historical cell phone tower data; and (4) the trial court violated Charles's constitutional right to present alternative perpetrator (aalt-perp) evidence. Charles also alleges that cumulatively these errors rendered his trial fundamentally unfair. After careful review of the record, we now affirm Charles's conviction.

## I.    BACKGROUND

Goldia Massey went missing in late September 2014. She was reported as missing by her son, Zach Massey. Close in time to her disappearance, it is undisputed that Goldia was with Charles.

Police began investigating Charles before they had located Goldia. Charles told police that he had been with Goldia but had dropped her off at her old residence and she had gotten into a white pick-up truck. He had not seen her since. Law enforcement went to Charles's home shortly after Zach reported Goldia missing and found that Charles had begun ripping up the carpet in his apartment. Charles claimed that Goldia was clearly high and frantic for drugs the evening he saw her. Police were suspicious and obtained a search warrant for Charles's home, as well as a warrant for both his and Goldia's cell phones.

On October 24, 2014, Goldia's dismembered arm was found washed up on the banks of the Kentucky River. Several weeks later, in December of 2014, her torso was found in the water. Fingerprint analysis and DNA testing confirmed that the found portions of the body were those of Goldia. The rest of Goldia's body has yet to be found. Medical examiners were unable to

2

determine cause of death but an anthropologist confirmed and opined that Goldia's body had been intentionally dismembered by a saw.

Upon execution of the first search warrant of Charles's home, after the discovery of Goldia's body, law enforcement officers used a chemical called "Bluestar." Bluestar is a forensic agent that chemically reacts when it is sprayed on blood, shining a bright blue to show officers where there may be blood present. Officers swabbed any areas that reacted for samples to send to the Kentucky State Police (KSP) Laboratory. While the search was conducted, Charles met with officers. He reiterated that he had not seen Goldia since he dropped her off and she left in a white pick-up truck. Upon questioning, he stated that Goldia's blood should not be in his home at all.

Police ultimately executed a second search warrant on Charles's home. KSP Lab confirmed that four of the samples sent to them from Charles's home contained blood that was DNA matched to Goldia. Several other swabs tested presumptively positive for blood but were not confirmed as blood; several of these items were, however, matched to Goldia's DNA (but could have been other genetic material). After being confronted with the fact that Goldia's blood was in his home, Charles claimed that Goldia had been to his home and had fallen down drunk several times, explaining the presence of blood. Detectives also reviewed Charles's and Goldia's cell phone records. A forensic analysis showed that both phones were signaling off of the same phone towers until about 12:40 a.m. the evening of September 20, 2014, the evening Zach Massey claimed his mother went missing. Charles's phone was once again signaling off

3

the tower near his home by 1:35 a.m. His phone signaled off a tower near the Kentucky River on September 22nd. Based on all this information, officers arrested Charles for Goldia's murder.

A six-day trial ensued, leading to Charles's conviction. Charles attempted to introduce aalt-perp evidence, alleging that Zach Massey had been the real culprit behind Goldia's disappearance and death. However, the jury instead found the Commonwealth's evidence compelling and found Charles guilty of murder and abuse of the corpse. We will explain further facts as necessary for our analysis.

## II. ANALYSIS

### A. Charles was not entitled to jury instructions for any lesser-included offenses.

"A trial court's decision on whether to instruct the jury on a particular offense is necessarily based upon the evidence." *Holland v. Commonwealth*, 466 S.W.3d 493, 499 (Ky. 2015). Due to the "trial court's closer view of the evidence, we review questions concerning the propriety of giving a particular instruction for abuse of discretion." *Id.* (citing *Ratliff v. Commonwealth*, 194 S.W.3d 258, 274 (Ky. 2006)). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Foley v. Commonwealth*, 425 S.W.3d 880, 886 (Ky. 2014) (citing *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999) (internal citations omitted)).

4

The Commonwealth asserted that Charles intentionally murdered Goldia, then intentionally dismembered and disposed of her body in the Kentucky River. The Commonwealth did not assert the method of homicide or the motive. However, their case was entirely circumstantial that the intentionality of Charles's conduct could be inferred by the gruesome and deliberate method of abuse to Goldia's corpse. Charles argued that, due to the lack of evidence regarding cause of death, he was entitled to a directed verdict. The defense's motions were duly considered and rejected by the trial court.

The Commonwealth did not assert any evidence that Charles may have had a less culpable mental state at the time of Goldia's death. More importantly, Charles did not produce any evidence relevant to his state of mind at the time of Goldia's death. Instead, the entire defense was a complete denial of any involvement in Goldia's death. Charles presented only one witness to question the veracity of the Commonwealth's timeline of Goldia's disappearance. Despite this lack of evidence, Charles requested and claimed he was entitled to jury instructions for the lesser included offenses of: manslaughter, first degree under extreme emotional distress; manslaughter, second degree; and reckless homicide. Charles claimed that there was no evidence as to how he intentionally killed Goldia so these other methods were just as possible as the intentional murder.

"An instruction on a lesser included offense is required only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a

5

reasonable doubt that he is guilty of the lesser offense." *Hudson v. Commonwealth*, 385 S.W.3d 411, 416 (Ky. 2012) (quoting *Houston v. Commonwealth*, 975 S.W.2d 925, 929 (Ky. 1998)). "However, the trial court has no duty to instruct on a theory not supported by the evidence." *Hudson*, 385 S.W.3d at 416 (citing *Payne v. Commonwealth*, 656 S.W.2d 719, 721 (Ky. 1983)). "In sum, while a defendant is entitled to jury instructions embodying defenses reasonably suggested by the evidence, he is not entitled to instructions for which there is no evidentiary support." *Allen v. Commonwealth*, 338 S.W.3d 252, 257 (Ky. 2011).

There was simply no evidence to support any of the alternative theories proposed by Charles's brief to this Court. The theories are purely hypothetical and speculative. There must be *evidence* to support the theory before an entitlement to a jury instruction arises. Charles really argues that because there was a lack of proof for intentional conduct and there was an instruction for intentional murder, he should be entitled to instructions on all other *possible* scenarios, no matter how hypothetical or unlikely. However, Charles misunderstands the requirements for a lesser included instruction.

First, there must be the possibility that the jury will reasonably doubt defendant's guilt as to the instructed charge. *See Holland*, 466 S.W.3d at 498 (quoting *Osborne v. Commonwealth*, 43 S.W.3d 234, 244 (Ky. 2001)). That possibility was clearly present here. It was possible that the jury could have rejected the Commonwealth's entire theory of the case and found Charles not guilty of murder.

6

However, there is a second requirement: "a reasonable juror could ... believe beyond a reasonable doubt that the defendant is guilty of the lesser offense." *Holland,* 466 S.W.3d at 498 (quoting *Osborne,* 43 S.W.3d at 244). There was simply no evidence to support any alternative wrongdoings. Although the jury could have determined there was not enough evidence for the charged crime and found Charles not guilty, that does not mean, ergo, that the jury would have acted reasonably in finding him guilty of a lesser offense. There was no evidence short of pure speculation to support any other theory. Had the jury harbored reasonable doubt as to Charles's intentional conduct in murdering Goldia, they would have had no basis for then finding him guilty beyond a reasonable doubt of any other lesser-included offense.

Charles was not entitled to any instructions on lesser-included offenses. We hold the court did not err in refusing to instruct the jury on any of the requested offenses.

### B. There was no reversible error in admitting any of the blood evidence.

Charles made several pretrial motions, both written and oral, regarding the admission of blood evidence sought to be introduced by the Commonwealth. He had two main objections to this evidence. One, Charles argued that any testing resulting in "presumptive" positive for blood without further confirmatory testing was inadmissible pursuant to Kentucky Rules of Evidence (KRE) 401, 402, and 403. Two, Charles argued that Detective Reiker's testimony about Bluestar testing in his home was inadmissible pursuant to KRE 702 and 403; additionally, Charles argued that the

7

Commonwealth's editing of the photographs of this testing enhanced the inadmissible and prejudicial nature of the photographs. We shall address each of these arguments in turn.

We note that the trial court's decisions on evidentiary rulings are granted "broad discretion" and these decisions should only be reversed "where there has been clear abuse of discretion." *Page v. Commonwealth*, 149 S.W.3d 416, 420 (Ky. 2004) (citing *Partin v. Commonwealth*, 918 S.W.2d 219, 222 (Ky. 1996)). "The test for an abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Webb v. Commonwealth*, 387 S.W.3d 319, 324 (Ky. 2012) (quoting *Anderson v. Commonwealth*, 231 S.W.2d 117, 119 (Ky. 2007) (citing *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000)).

**1) The evidence of presumptive testing was properly admitted.**

Marci Adkins with Kentucky State Police Lab testified at Charles's trial. She testified about several items presented to the lab for testing. First, Ms. Adkins conducted a visual examination of the items, then swabbed areas for testing. Second, she conducted what is known as the Kastle-Meyer test, which tests for the presence of blood. Without further confirmation, Ms. Adkins stated that items returning a positive result under this test can only be termed as "presumptive blood," as only additional confirmation testing could conclusively establish the presence of blood of human origin. Ms. Adkins admitted that relevant literature notes that this test can result in false positives, although she has yet to see a false positive personally in her own

8

experience. Third, if the sample was large enough, Ms. Adkins conducted confirmation testing. Fourth, presumptively positive items were forwarded to another lab employee for DNA testing.

Out of the 14 items[1] Ms. Adkins tested from various areas in Charles's home, 10 items were presumptively positive for blood under the Kastle-Meyer test. Four of these items were confirmed as blood and tested presumptively as human blood. The other six items were insufficient samples to allow for confirmation testing and were instead forwarded on for DNA testing without confirmation. Nine of the ten total items that were presumptively positive for blood matched Goldia's DNA at a probability of either 1 in 20 quadrillion or 1 in 25 quadrillion; the tenth and final sample was insufficient to establish a DNA profile.

Although the legal basis for Charles's objection was not fully enumerated in his brief, the pretrial filings and hearings regarding this issue show that Charles's objection was under KRE 401 and 403. First, he argues that the "presumptive" nature of this testing rendered it irrelevant and, therefore, inadmissible. Alternatively, if the evidence was relevant, Charles argues that the questionable nature of the testing caused the evidence's probative value to be substantially outweighed by its prejudicial nature.

We begin with the premise that the standard for relevance "is powerfully inclusionary and is met upon a showing of minimal probativeness." *Roe v.*

---

[1] This count excludes the buccal swab from Charles used as a standard in the DNA testing.

*Commonwealth,* 493 S.W.3d 814, 820 (Ky. 2015) (internal citations omitted). This rule tends to have a "favor toward relevant evidence, reflecting the general inclusive thrust in Kentucky evidence law." *Manery v. Commonwealth,* 492 S.W.3d 140, 147 (Ky. 2016). Relevant evidence is "evidence having *any tendency* to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401 (emphasis added).

We hold without question that the presumptive test results here are relevant. Evidence must not be absolutely conclusive without question in order to be relevant. Here, Ms. Adkins testified that the methodology had faults but was generally reliable and she herself had never seen a false positive result.[2] She testified that she could not conclusively say the items that were not confirmed were, in fact, blood. However, this does not make the evidence irrelevant. It just provides information for the jury to utilize in the weighing of this evidence. This evidence clearly tended to prove that the victim underwent some kind of trauma in the home, leaving traces of her blood. Even with the caveat that this blood evidence was unconfirmed, it still tended to prove this vital fact of the Commonwealth's case. Thus, given the evidence's relevance, we must determine whether the prejudicial effect substantially outweighed this probativeness.

---

[2] It is important here to note that Charles did not question the scientific reliability of these tests under *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592 (1993), and we therefore do not address the admissibility of this testing under that standard but rather only address the admissibility under KRE 401 and 403.

10

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." KRE 403. When determining whether this danger substantially outweighs the probative value of the evidence, the court has three determinations:

> (i) Assessment of the probative worth of the evidence whose exclusion is sought; (ii) assessment of the probable impact of specified undesirable consequences likely to flow from its admission ... ; and (iii) a determination of whether the product of the second judgment (harmful effects from admission) exceeds the product of the first judgment (probative worth of evidence).

*Webb v. Commonwealth*, 387 S.W.3d 319, 326 (Ky. 2012) (quoting *Partin*, 918 S.W.2d at 222). The rule "does not offer protection against evidence that is merely prejudicial in the sense that it is detrimental to a party's case." *Webb*, 387 S.W.3d at 326 (citing *Carter v. Hewitt*, 617 F.2d 961, 972 (3d Cir. 1980); *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 427 (5th Cir. 2006)).

In *Manery*, this Court was presented with the admissibility of a forensic test, resulting in a presumptive positive for gonorrhea. 492 S.W.3d at 147-49. The test result was relevant as it tied Manery to the child victim. *Id.* at 147. Manery, like Charles here, argued that the presumptive nature of the test rendered it irrelevant or that the possibility of false-positives made the test results innately and unfairly prejudicial. *Id.* at 148. But this Court recognized that "each type of forensic test carries its own methodology and its own processes in reaching a reliable result in addition to its own risks for error ...

11

some tests are more accurate than others." *Id.* Despite these inherent risks, "[f]orensic evidence, so long as it may be reasonably relied upon, is perhaps the best evidence available to the Commonwealth" in both *Manery* and in the case before us now. *Id.* at 148-49. Given the circumstances of the presumptive test in *Manery*, the Court was "left only with the argument that it *might* have resulted in a false-positive—a concern implicit in every consideration of forensic evidence—coupled with the failure to conduct additional testing to reach a formal diagnosis ... " *Id.* at 149. The Court, nonetheless, held the trial court did not abuse its discretion in admitting the evidence.

Likewise, we hold that the trial court did not err in determining this evidence was also admissible. We have outlined the clear and prevalent relevance of the evidence. The Commonwealth's case was purely circumstantial. Charles initially denied that any of Goldia's blood would be in his home, yet the lab confirmed four separate swabs as blood matching the victim. Six other presumptive positives for blood at six other locations on the walls of Charles's home are obviously highly relevant, not only as evidence of the crime itself but his lies about the crime. We are also unpersuaded that these test results were unduly prejudicial to overcome this level of probativeness. Ms. Adkins was forthright in admitting that she cannot call these test results confirmed blood. She admitted that the literature about this testing quantifies false positive test results. Defense crossed her effectively on the value of this testing. These facts were then, appropriately, left for the jury

12

to weigh and measure in its ultimate decision. There was no error in admitting this evidence.

## 2) Admitting the Bluestar evidence was not palpable error.

As previously stated, upon execution of a search warrant for Charles's home, officers utilized a chemical called Bluestar to forensically examine the home. Prior to trial, the defense objected to any introduction of evidence regarding the use of Bluestar. Charles argued three main objections: (1) the testimony required expert testimony which had not been disclosed or noticed pursuant to the rules of discovery; (2) the Commonwealth edited the photographs showing the Bluestar reaction, creating a prejudicial effect; and (3) the introduction of the photographs and testimony violated KRE 403. The trial court dismissed the discovery violation, noting that information regarding the Bluestar testing was within discovery and thus, defense was on notice. As to the requirement for expert testimony, the court simply noted that someone appropriately qualified could testify about the testing. Defense failed to request a *Daubert* hearing or object as to the scientific reliability of the evidence or qualifications of the expert witness, either pre-trial or during trial on this matter. The trial court also dismissed any further objections, noting it determined that based on the facts of the case, the Bluestar testing was a recognized technique and relevant.

Detective Bill Reiker testified for the Commonwealth at trial about the use of this forensic tool. He explained that Bluestar is a forensic agent that chemically reacts when it is sprayed on blood, reacting with the iron in

13

hemoglobin, shining a bright blue to show officers where there may be blood present. Det. Reiker testified briefly of his experience with the forensic agent and his brief training in the use of it. He explained that most of his training was through on-the-job training and he had utilized Bluestar about twenty times in processing crime scenes. He testified specifically as to several areas in Charles's home that reacted when sprayed with Bluestar. Swabs were taken from these areas and several were forwarded on to the lab for testing.

We will address each of Charles's arguments regarding this evidence in turn, and explain further facts as necessary.

### i. Allowing the detective to testify as a lay witness without proper qualification was not palpable error.

In his brief before this Court, Charles argues that Det. Reiker "was not an expert witness." Charles recounts Det. Reiker's limited experience and education, opining that Det. Reiker was simply unqualified pursuant to KRE 702 to testify as to this technical and scientific testing. Charles notes that the Commonwealth called Det. Reiker as a lay witness and failed to qualify or notice him as an expert witness. Despite these seemingly valid arguments regarding the technical nature of this testimony, Charles simply failed to challenge Det. Reiker's testimony under *Daubert*, as an unqualified witness giving expert testimony. Instead, Charles placed his sole objection to this testimony as a discovery violation.

The Commonwealth cannot, and should not, attempt to disguise expert testimony as lay witness testimony. Likewise, the Defense cannot remedy its failure to properly challenge an expert witness by claiming that the

14

Commonwealth called the witness as a non-expert. While the Defense is not responsible for putting the Commonwealth on notice that the testimony in question is expert, thereby giving up a strategical advantage should the Commonwealth forego appropriate notice, the Defense must still make the appropriate objections.

We would note here that we have serious questions as to the Commonwealth's practice of this issue. The Commonwealth seemed intent on presenting this testimony as lay testimony, avoiding discovery disclosures and notices, rather than being forthright with the production of technical evidence. We would again remind the Commonwealth of a prosecutor's duty to ensure the fairness of a trial, for victims and defendants, alike. However, given this information, we must acknowledge that Charles failed to make the appropriate objections or requests for hearings under KRE 702 and *Daubert*. The Commonwealth correctly notes that we have, in the past, noted our unwillingness to speculate as to the results of an unrequested *Daubert* hearing. *See Tharp v. Commonwealth,* 40 S.W.3d 356, 367-68 (Ky. 2000) ("We decline to speculate on the outcome of an unrequested *Daubert* hearing, or to hold that the failure to conduct such a hearing *sua sponte* constitutes palpable error."). As such, we are forced to review this issue under palpable error review.

Under Rule of Criminal Procedure (RCr) 10.26, "[a] palpable error which affects the substantial rights of a party may be considered ... by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that *manifest injustice*

15

has resulted from the error" (emphasis added). "When an appellate court engages in a palpable error review, its focus is on what happened and whether the defect is so manifest, fundamental and unambiguous that it threatens the integrity of the judicial process." *Martin v. Commonwealth*, 207 S.W.3d 1, 5 (Ky. 2006).

Under KRE 702, "a witness qualified as an expert" can testify as to "scientific, technical, or other specialized knowledge." We note a situation similar to the present case in *Mondie v. Commonwealth*. There, the Commonwealth had two officers testify regarding firearm ejection patterns without qualifying or presenting those witnesses as experts. *Mondie v. Commonwealth*, 158 S.W.3d 203, 210-12 (Ky. 2005). In *Mondie*, the defense did object to the testimony being from a lay witness but "he did not object to the failure to qualify [the officer] as an expert on ejection patterns and did not request a *Daubert* hearing." *Id.* at 212 (internal citations omitted). There, we noted that "[o]rdinarily, this matter would be resolved by the fact that the error was not preserved." *Id.* However, because the case was reversed, we provided further guidance on the issue for retrial. *Id.*

Here, the issue was even less preserved than in *Mondie*. Defense requested discovery sanctions but did not request a *Daubert* hearing, object to the officer presenting expert testimony as a lay witness, or present a contemporaneous objection to any of the testimony at trial. Det. Reiker's testimony was clearly technical, requiring expert knowledge. He testified as to chemical reactions leading to a conclusion that blood was present on the walls

16

– a conclusion to which a member of the general public could not reach without specific training or knowledge. This is the epitome of testimony under the umbrella of KRE 702.

The Commonwealth failed to honestly present this testimony as expert testimony. However, Charles failed to appropriately object or question the reliability of this testimony or the qualifications of the witness to give such testimony. We will not "speculate on the outcome of an unrequested *Daubert* hearing." *Tharp*, 40 S.W.3d at 367-68. Without further information in the record, we cannot say that the detective would not have been qualified as an expert or that the trial court would have found the evidence inadmissible. We decline to speculate as to what could have been. We cannot even say that the trial court erred – had the trial court been presented with a *Daubert* challenge, we would be faced with a very different decision. But we cannot assume what would or would not have happened. As such, we cannot say that this situation led to "manifest injustice." There is no palpable error in Det. Reiker testifying as to the Bluestar testing and photographs.

> ### ii. Although the Commonwealth should have notified the Defense of the alteration to the photographs, the photographs were still otherwise admissible pursuant to KRE 901 and 403.

The Commonwealth compounded our reservations as to this particular presentation of evidence by altering the images and failing to notify the Defense of this edit. Det. Reiker photographed several images of the chemical reaction created by the Bluestar in Charles's home during their search. These images were turned over to the Commonwealth and Defense. The Commonwealth,

17

however, felt that the images were not clear enough and decided to alter the contrast of the photographs to make the Bluestar chemical appear an even brighter blue in the photographs. Our main concern with this issue is that the Commonwealth did not tell the Defense of this alteration. Instead, only after being challenged three separate times during a pretrial hearing as to whether these images were edited did the prosecutor finally admit that someone in her office had changed the contrast in the photographs. Charles promptly objected to the admission of this evidence.

We must take this opportunity to once again remind the agents of the Commonwealth of their very special and particular duty. "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence." SCR 3.130, Editors' Notes, cmt. (1). Prosecutors owe the public a unique obligation to not only zealously advocate for their case but to ensure that they are honestly and forthrightly searching for the truth while upholding the sacred rights bestowed upon every defendant charged with a crime. As such, we would remind prosecutors not to play games with evidence but to be open and fair in their production of evidence. Simply telling the Defense about an alteration to a photograph – an alteration that was admittedly purely technical – with sufficient time to bring a motion before the trial court would have protected Charles's rights.

However, given this concern, we must still hold that the evidence as presented was admissible. For a photograph to be properly admitted, it must simply be authenticated pursuant to KRE 901 and be otherwise admissible under our rules of evidence. We hold that these photographs met the threshold for KRE 901 and the probativeness of the photographs was not substantially outweighed by any prejudicial effect.

KRE 901 requires "authentication or identification as a condition precedent to admissibility," which "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." This burden "is slight, which requires only a prima facie showing of authenticity to the trial court." *Johnson*, 134 S.W.3d at 566 (citing *United States v. Reilly*, 33 F.3d 1396, 1404 (3d Cir. 1994)). Despite the Commonwealth's editing of the photographs, Det. Reiker testified that the color of the printed photographs was accurate as to what he saw that day while applying the Bluestar formula. He testified that due to coloring, the reaction was not as bright in the initial photographs as it was that day. As such, the photographs were what they purported to be. This satisfies KRE 901 for authentication.

Charles also argues that this evidence should have been excluded under KRE 403 as it was "massively misleading." Charles's premise is that, because Bluestar can result in a positive chemical reaction to substances other than blood, the potentiality for prejudice overwhelmed any possible probativeness. However, this argument, just as in Charles's argument regarding presumptive testing, must fail. The requirement for probativeness is slight. Despite this

19

minor requirement, the probative value of this evidence was very high. It made the possibility (not an actuality) that Goldia's blood was in Charles's home much more likely. This possibility was couched in terms of potential errors by both the Commonwealth and Charles. Det. Reiker admitted that some substances other than blood can result in positive reactions to Bluestar. However, it still made it more likely that Goldia's blood was present in that home. And that was verified by later lab testing. As we stated in *Manery,* "each type of forensic test carries its own methodology and its own processes in reaching a reliable result in addition to its own risks for error ... " 492 S.W.3d at 148. These speculative possibilities do not undermine the relevance of the evidence; this still requires a weighing of relevance and prejudice. Here, the relevance still outweighed any possible prejudice. This prejudice was mitigated by an effective cross-examination. Thus, we hold the trial court did not err in permitting Det. Reiker to testify about the Bluestar testing and admitting the Bluestar photographs.

**C. The trial court properly admitted cell tower data evidence.**

We preface our analysis of this issue, as presented by Charles, by explaining that we are deeply troubled by the procedural idiosyncrasies created by the parties and the trial court in this case. Thus, we must first explain the procedural progress of this issue and our interpretation of those situations.

In January 2016, the trial court conducted a hearing on several motions by both the Commonwealth and Defense, including the Defense motion to exclude Sergeant David Richardson from testifying as an expert witness

regarding historical cell tower data, pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, and KRE 702. At that hearing, the Commonwealth first argued that a *Daubert* hearing was unnecessary and asked to present Sgt. Richardson as a witness to explain his background and the information to which he would testify at trial. The trial court heard that testimony, after reiterating the Commonwealth's statement that all the parties were not in court that day for an actual *Daubert* hearing.

The Commonwealth took extensive testimony from Sgt. Richardson on his experience in law enforcement, training generally and specifically on historical cell tower data and its usage, the phone records in this case, the meaning of those cell phone records, and the import those records carry, so far as providing a possible location of both the Defendant and the victim in the relevant time period. Sgt. Richardson testified that the cell phones of the Defendant and the victim were "pinging," or signaling off of, the same cell phone towers at the time of the victim's disappearance.[3] Sgt. Richardson then testified that the victim's cell phone stopped pinging any cell phone towers at a certain time, implying that it was out of range or turned off. Sgt. Richardson concluded that, based on this evidence, the Defendant and victim were either together or in close proximity to each other during the day of Goldia's alleged disappearance.

---

[3] For a more in-depth explanation of the logistics and technicality of historical cell phone data, please see this Court's opinion in *Holbrook v. Commonwealth*, 525 S.W.3d 73, 79-80 (Ky. 2017).

The Defense conducted an extensive cross-examination as to Sgt. Richardson's lack of significant training regarding cell phone records and his lack of knowledge as to certain information regarding these records. She also questioned him about the extent of the conclusion he could make from these records; he admitted that he could not say for sure that Charles and the victim were together. Instead, he could just state that their cell phones were pinging the same cell phone towers, implying they were at least close to each other. At that time, the judge continued the hearing to the following Monday and both parties stated Sgt. Richardson was not needed for any further testimony.

On January 25, 2016, the hearing continued with argument from both sides. The Commonwealth argued that all of Charles's issues go to weight of the evidence and not admissibility; the prosecutor also argued that Sgt. Richardson was qualified to testify to these records. Charles, in turn, argued that the testimony involved technical and scientific information and Sgt. Richardson must be qualified as an expert witness to testify to these matters. Charles noted that the Commonwealth had not requested that Sgt. Richardson be recognized as an expert or noticed him as an expert pursuant to the Rules of Criminal Procedure. Charles concluded that Sgt. Richardson could not testify to these matters as a lay witness.

After some back and forth on this issue between the parties and the trial court, the Commonwealth then stated that "to a certain extent," Sgt. Richardson was an expert and could testify based on his specialized knowledge. Charles remarked on the "disingenuous" nature of the

22

Commonwealth's statement, given that the Commonwealth had argued against any kind of need for a *Daubert* hearing because the witness did not need to be an expert. The trial court continued to ask the Defense what expert opinions Sgt. Richardson was making that led to the Defense objection.

The trial court asked the Commonwealth how the witness was qualified to make the statements to which he would testify. The Commonwealth stated that he was qualified from his training. The judge asked if they needed another hearing to add to this information; the Commonwealth stated it did not think they would have any further information to add and Defense counsel remained silent and *did not request* further testimony on the subject. From this exchange, this Court must assume that the parties intended the testimony from Sgt. Richardson to be utilized to make rulings on this issue and did not request or need further testimony from any witnesses.

At that time, the judge stated that the witness could testify the same way he did at the hearing regarding this issue. The trial court stated that it was "persuaded [Sgt. Richardson] knows what he's talking about," and knew enough about the subject matter of his testimony. The judge found him to be "well-qualified." The judge stated that it was not an expert opinion but the witness was only a technician of the records. Defense counsel repeatedly asked whether this witness was being treated as an expert or lay witness; the trial court merely stated that he was not sure that matter was ever resolved by the hearing.

23

In May 2016, the Commonwealth entered a notice of expert testimony to the court and Defense, and included Sgt. Richardson as an expert witness. At a hearing on June 6, 2016 regarding a suppression motion, Defense counsel asked for clarification on this issue. The trial court then held that, based on Sgt. Richardson's work, training, and expertise, he was qualified to testify as an expert about the cell phone records. The judge found that this information would be helpful to the jury and he was persuaded that the witness knew what he was talking about. He overruled the Defense motion to exclude the witness. Defense counsel then seemed to argue that the witness should only be allowed to testify as a lay witness and stated she would supplement the record with a brief of authority. The trial court followed up this oral hearing with a written order, overruling the Defense motion.

### 1) Historic cell phone data requires an expert witness.

At the outset, we must hold that the evidence in question was specialized, technical knowledge requiring a qualified witness under KRE 702. Under the rule, only "a witness qualified as an expert" may testify to "scientific, technical, or other specialized knowledge." If there is "a proffer of expert testimony, the trial judge must determine at the outset of trial ... 'whether the expert is proposing to testify to (1) scientific [, technical, or other specialized] knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Goodyear Tire & Rubber Co.*, 11 S.W.3d at 578 (quoting *Daubert*, 509 U.S. at 592). To the first issue, the judge must decide whether this evidence falls under KRE 702.

24

When faced with the cell phone records in this case, a lay witness would not have the necessary knowledge to interpret the meaning or import of those records. This fact is further evidenced by the Commonwealth's own questioning regarding Sgt. Richardson's training with the FBI and other organizations on how to read and interpret cell phone records like the ones at issue here. This is technical knowledge that requires an expert witness to explain. Thus, the requirements of KRE 702 must have been fulfilled for Sgt. Richardson to testify as he did at trial about the meaning of these records.

### 2) The trial court did not abuse its discretion in holding Sgt. Richardson was qualified as an expert witness.

At first, the handling of the Defense motion to exclude creates some confusion as to what issues the court and parties were addressing. The odd practice of having a preliminary hearing as to whether a hearing is needed – but then treating that testimony as sufficient for a hearing – gives this Court pause and doubt as to the procedural adequacy of the proceedings. However, we must treat the proceedings as the parties did and do our best to ensure the fairness of those proceedings.

Although the Commonwealth initially argued that Sgt. Richardson did not need to be an expert, the prosecution questioned him as to his qualifications and later submitted notice regarding his expert testimony. Although Charles initially argued that Sgt. Richardson could not testify as a lay witness, he later argued that Sgt. Richardson was not qualified as an expert and could *only* testify as a lay witness. The trial court initially stated Sgt. Richardson did not need to be an expert but, after the Commonwealth entered

its notice, still found him to be qualified as an expert based on its initial findings after the hearing. The trial court gave Charles an opportunity to request further testimony or additional time to present evidence as to the reliability of the methods of cell phone data during argument in January 2016; however, Charles did not take advantage of that opportunity. All parties treated the testimony from Sgt. Richardson as testimony that would have been repeated had a formal *Daubert* hearing occurred. We shall, therefore, treat that testimony in the same manner – as testimony for the purposes of a *Daubert* hearing. As such, we must view the trial court's decision based on the evidence it had before it.

"A trial court's ruling on the admission of expert testimony is reviewed under the same standard as a trial court's ruling on any other evidentiary matter." *Goodyear Tire & Rubber Co.*, 11 S.W.3d at 578 (citing *Fugate v. Commonwealth*, 993 S.W.2d 931, 935 (Ky. 1999) and *Justice v. Commonwealth*, 987 S.W.2d 306, 214-15 (Ky. 1998)). "[A]buse of discretion is the proper standard of review," therefore, for a ruling on admission of expert testimony. *Goodyear Tire & Rubber Co.*, 11 S.W.3d at 577 (internal citations omitted). "The decision as to qualifications of an expert rests in the sound discretion of the trial court and we will not disturb such ruling absent an abuse of discretion." *Fugate*, 993 S.W.2d at 935 (citing *Kentucky Power Co. v. Kilbourn*, 307 S.W.2d 9 (Ky. 1957) and *Ford v. Commonwealth*, 665 S.W.2d 304 (Ky. 1983)). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."

26

*Foley*, 425 S.W.3d at 886 (citing *English*, 993 S.W.2d at 945 (internal citations omitted)).

We cannot say that the trial court's decision here, to qualify Sgt. Richardson as an expert and allow him to testify as to the cell tower data, was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *See Foley*, 425 S.W.3d at 886. Although technical knowledge, the testimony did not require particularized testing. Sgt. Richardson testified as to multiple years in law enforcement; multiple times reviewing records like these; specialized training he had undergone; communications with cell phone companies to obtain further information about records; and several years' experience in the general field of law enforcement forensics. The trial judge specifically stated that based on Sgt. Richardson's work, training, and expertise, he found the officer to be qualified to explain these records to the jury. Based on the information in the record before us, we cannot hold that such a decision was an abuse of discretion.

We still recognize "that the admission of historical cell-site evidence is a matter to be assessed carefully." *Holbrook*, 525 S.W.3d at 82. However, here, as in *Holbrook*, the "testimony was relevant and probative." *Id.* Although Defense counsel questioned Sgt. Richardson's lack of ability to answer specific questions she posed, this is a matter of weight rather than admissibility. An expert must not be infallible to be qualified; based on the information before it, this was a matter soundly in the trial court's discretion. We still caution trial courts to carefully assess the nature of this proffered evidence—both the

27

qualifications of the expert and the reliability of the evidence. But based upon our review of the circumstances in this case, we cannot say the trial court's decision was an abuse of that discretion.

### 3) The trial court did not abuse its discretion in admitting the cell phone evidence under KRE 403.

Charles also argues that admission of this evidence violated the tenets of KRE 403. Here, we must reiterate our holding as to the presumptive blood testing. The threshold for relevance is a "minimal" showing of probative value. *See Roe*, 493 S.W.3d at 820 (internal citations omitted). The evidence had a tendency to prove the Commonwealth's theory that Charles and Goldia were together on the evening that she was murdered. Additionally, the probative value of this evidence was not substantially outweighed by any undue prejudice. *See* KRE 403. Although the evidence was prejudicial, it was not unduly prejudicial. KRE 403 "does not offer protection against evidence that is merely prejudicial in the sense that it is detrimental to a party's case." *Webb*, 387 S.W.3d at 326 (citing *Carter*, 617 F.2d at 972 and *Brazos River Auth.*, 469 F.3d at 427). The evidence was highly probative; the prejudice did not rise to the level of undue prejudice requiring exclusion under KRE 403. The issues Charles presented with this evidence are issues of weight, rather than admissibility. The jury was properly entrusted with the evidence to give it its due weight in making an ultimate decision regarding guilt. We hold the trial court did not abuse its discretion in admitting this evidence.

## D. The trial court did not abuse its discretion in excluding any of the aalt-perp evidence.

Charles next alleges that his right to present an alternative perpetrator defense was severely limited by several of the trial court's evidentiary rulings. "The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the opportunity to present a full defense, and that guarantee includes the right to introduce evidence that an alternate perpetrator committed the offense." *Gray v. Commonwealth,* 480 S.W.3d 253, 266 (Ky. 2016) (citing *Harris v. Commonwealth,* 134 S.W.3d 603, 608 (Ky. 2004)). For aalt-perp evidence to be admitted, "all KRE 403 requires is evidence of some logical, qualifying information to enhance the proffered evidence beyond speculative, farfetched theories that may potentially confuse the issues or mislead the jury." *Gray,* 480 S.W.3d at 268.

However, this does not make aalt-perp evidence automatically admissible. It must still be admissible under the other rules of evidence. Our aalt-perp standard merely offers guidance in determining the relevance of these aalt-perp theories. This Court agrees that the "latitude" states have to create rules of evidence is limited by the Constitution. *See Holmes v. South Carolina,* 547 U.S. 319, 324 (2006). The constitutionally guaranteed right to present a defense must not be "abridged by evidence rules that 'infring[e] upon a weighty interest of the accused' and are ['']arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *Id.* (quoting *United States v. Scheffer,* 523 U.S. 303, 308 (1998) (quoting *Rock v. Arkansas,* 483 U.S. 44, 58, 56 (1987))). Thus,

29

we must determine the admissibility of each of the proffered items from Charles to determine if they were, independently, admissible under our rules of evidence. These evidentiary rulings of the trial court are still reviewed for abuse of discretion. *See Gray,* 480 S.W.3d at 268. We must also determine whether the rules in question arbitrarily infringe upon Charles's right to present a defense, and deprived him of a fair trial.

Before beginning the analysis of the excluded evidence, we would note that Charles did provide a robust cross-examination of Zach Massey. Defense crossed Massey about: his erred reporting of the date of his mother's disappearance; his knowledge of a friend who owned a white truck (as Charles claimed Goldia had left in the night of her disappearance) and his failure to report it to police; his tumultuous relationship with his mother; his extensive drug use; his inconsistencies in explaining the date of his mother's disappearance; and the police's failure to ever obtain Massey's DNA for analysis. Thus, while some of the proposed evidence was excluded, Charles did provide a wealth of aalt-perp evidence to support his theory of the crime.

### 1) Robbery with Box Cutter

Charles requested to ask Massey about a robbery from December of 2014, for which Massey was later convicted. Charles also requested to ask about his use of a box cutter as a weapon during that robbery. The conviction and crime are governed by KRE 609 and the use of the weapon falls under KRE 404.

Charles does not argue that Massey's conviction was relevant for any purposes other than impeachment. Thus, we must determine whether the conviction was admissible pursuant to KRE 609. Under that rule, evidence of a conviction is admissible "if the crime was punishable by death or imprisonment for one ... year or more under the law ..." Additionally, "[t]he identity of the crime upon which conviction was based may *not* be disclosed upon cross-examination *unless* the witness has denied the existence of the conviction" (emphasis added). The existence of this conviction is clearly admissible. Charles was permitted to ask this question of the witness. However, without a denial of the conviction, the identity of the crime was simply inadmissible pursuant to the rule. As such, the court's decision to exclude such evidence was not an abuse of discretion.

Charles also requested to ask Massey about his use of a box cutter during the commission of this crime. Assuming this evidence could be separated from the identity of the crime, such admission would still violate KRE 404. Charles's intent was to show a tendency for violence from the witness, thereby creating the impression that he could have acted in accordance with such character, and killed his mother. During arguments before the court, Charles claimed that this evidence fulfilled about "every exception to 404(b)" and yet failed to enumerate how, either at trial or in his brief. This Court fails to recognize how such a prior bad act would meet one of the exceptions; if the Commonwealth had submitted this evidence about Charles, we would make a similar ruling. This evidence was offered purely for

31

propensity purposes. As such, we hold that the trial court did not abuse its discretion in preventing Charles from raising these issues during Massey's testimony.

### 2) Prior Domestic Violence with Goldia

Charles also requested that the Court allow him to ask Massey about a prior incident of domestic abuse with his mother, Goldia. This incident occurred in 2006, while Massey was still a minor and led to a petition in juvenile court. The date of the incident would have been eight years prior to Goldia's disappearance. The Commonwealth objected to introduction of this evidence but conceded that Charles should be allowed to ask whether there had been any element of physical abuse or altercations between Massey and his mother during the year of 2014 before she disappeared. The Court agreed and ruled accordingly. Charles now argues he should have been permitted to ask about this incident from 2006.

This evidence is, once again, evidence of a prior bad act under KRE 404(b). Additionally, it is offered to prove that Massey may have acted in accordance with that bad act and killed his mother. Thus, the evidence must meet one of the exceptions under KRE 404(b) to be admissible. This Court agrees that this evidence could be offered to prove motive; a history of violence could potentially lead to a motive for murder. However, the issue with admissibility arises from the temporal remoteness. "[P]rior acts are not admissible when the conduct occurred too remote in time to fairly represent any reasonable application to the present crimes." *Driver v. Commonwealth,*

32

361 S.W.3d 877, 884 (Ky. 2012) (citing *Barnes v. Commonwealth*, 794 S.W.2d 165, 169 (Ky. 1990)).

The prior act of physical violence was against the victim, making it far more relevant. *See Driver*, 361 S.W.3d at 885. But, it occurred over eight years prior to the murder, while Massey was still a juvenile. Given these circumstances, we cannot say that the trial court did not properly exercise its discretion in making its decision to exclude the evidence. The trial court weighed the facts of the situation but, given the remoteness of the time, chose to limit the period for which Charles could question the witness about violence against Goldia. We hold that such a decision was a proper exercise of discretion.

### 3) 2007 Tampering

The last piece of aalt-perp evidence Charles sought to introduce during Massey's testimony was evidence of an incident in 2007. At that time, Massey had disposed of a stolen cell phone in the river. Charles claimed that this evidence showed knowledge of ability to dispose of evidence. The trial court believed the evidence would violate KRE 404(b) but reserved ruling until hearing the context of the testimony. Contrary to Charles's machinations in his brief, this issue was not preserved. Defense counsel did not attempt to ask these questions at trial nor broach the topic with the court again. Charles attempts to argue that, because the trial court limited the questioning regarding physical abuse to 2014, this line of questioning would have also been excluded. We cannot assume this fact, however. While we understand the

33

Commonwealth's argument that this issue was waived, we will review this issue for palpable error to ensure the fairness of Charles's proceedings. *See* RCr 10.26.

The trial court correctly determined that the evidence of tampering would fall under KRE 404(b). Similar to the physical altercation evidence, this evidence would have only been admitted to show conformity of behavior therewith. Although, arguably, this evidence may go to plan or knowledge, that link is tangential at best. Given the temporal remoteness and low probative value, we hold that there was no palpable error in excluding such evidence.

### 4) KRE 609 and 404 do not arbitrarily prohibit a defendant's right to present a defense.

The right to present a defense "does not ... abrogate the rules of evidence." *McPherson v. Commonwealth*, 360 S.W.3d 207, 214 (Ky. 2012). Even if these rules of evidence would prohibit admission of evidence, if those rules arbitrarily prohibit a defendant's ability to present a defense, the defendant's constitutional rights are violated. "[T]he defendant's interest in the challenged evidence must be weighed against the interest the evidentiary rule is meant to serve, and only if application of the rule would be arbitrary in the particular case or disproportionate to the state's legitimate interest must the rule bow to the defendant's right." *Id.* (citing *Montgomery v. Commonwealth*, 320 S.W.3d 28, 41 (Ky. 2010); *Holmes*, 547 U.S. 319; and *Scheffer*, 523 U.S. 303). As such, we must examine the nature of KRE 609 and 404 to determine whether they arbitrarily act in a way to prohibit a defendant's ability to present aalt-perp evidence. We hold that KRE 609 and 404 do not arbitrarily prohibit

34

the right to present a complete defense and are grounded in reasonable attempts to govern the introduction of evidence at trial.

In examining Federal Rule of Evidence 609, similar to KRE 609, the United States Supreme Court stated that "[e]vidence that a litigant or his witness is a convicted felon tends to shift a jury's focus from the worthiness of the litigant's position to the moral worth of the litigant himself." *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 510 (1989). The Court spent considerable time reviewing the history of the rule and the attempt in its drafting to prevent unfair prejudice to witnesses and accused parties. *Id.* at 510-21. Our rule of evidence also attempted to manage the effect of undue prejudice while still favoring admissibility of evidence where relevant. The rule allows evidence of convictions but prevents admission of details regarding crimes and circumstances of conviction unless offered by the witness. This rule is far from arbitrary; in fact, in most cases it protects an accused who chooses to testify but has a criminal conviction. The rule is applied to all parties, be he a defendant or witness. The rule serves the purpose of giving the jury information while still prohibiting an influx of prejudicial information that may mislead or confuse the jury. Thus, application of this rule to Charles's case did not violate his constitutional rights.

KRE 404 also serves a valid and legitimate purpose. The "evidentiary rule seeks to prevent the admission of evidence of a defendant's previous bad actions which 'show a propensity or predisposition to again commit the same or a similar act.'" *White v. Commonwealth*, -- S.W.3d --, 2014-SC-000725-MR,

35

2017 WL 3635130, *3 (Ky. Aug. 24, 2017). The rule, of course, also applies to prior bad acts of witnesses. *See McPherson*, 360 S.W.3d at 213-14. Thus, again, the rule attempts to protect both defendants and witnesses from being unfairly prejudiced; it provides an avenue for relevant evidence to be submitted to the jury while still protecting the process from an inundation of prejudicial information that may only tangentially relate to the crime at hand. Once again, this rule is neither arbitrary nor disproportionate to the state's interest. Therefore, we hold that the trial court acted properly in excluding the proposed aalt-perp evidence and Charles's constitutional right to present a defense was not violated.

### E. There was not cumulative error.

Under the doctrine of cumulative error, "multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010). However, "[w]e have found cumulative error only where the individual errors were themselves substantial, bordering, at least, on the prejudicial." *Id.* (citing *Funk v. Commonwealth*, 842 S.W.2d 476 (Ky. 1992)). In this case, while we have questioned the sufficiency of some of the proceedings in the court below, we have found no reversible error. We have found no error on any preserved issues; on unpreserved issues, we have not found any palpable error. None of the issues together are so substantial as to create a fundamentally unfair effect. Thus, we hold there was no cumulative error rendering Charles's trial unfair.

36

## III.    CONCLUSION

After thorough examination, and procedural scrutiny, we hold that Charles's trial was fair and constitutionally adequate. We thereby affirm the judgment of the Fayette Circuit Court.

All sitting. All concur.

COUNSEL FOR APPELLANT:

John Gerhart Landon
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

James Coleman Shackelford
Assistant Attorney General