Kenneth D. HUDSON, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2011–SC–000103–MR.

Supreme Court of Kentucky.

June 21, 2012.

Samuel N. Potter, Department of Public Advocacy, Assistant Public Advocate, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, Joshua D. Farley, Assistant Attorney General, Attorney General's Office, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice VENTERS.

Appellant Kenneth D. Hudson appeals as a matter of right from a judgment of the Christian Circuit Court convicting him of murder as an accomplice. Appellant argues on appeal that the trial court erred in declining to instruct the jury on theories of accomplice liability for first-degree manslaughter, second-degree manslaughter, and reckless homicide. He preserved the issue for appellate review by tendering to the trial court jury instructions on the lesser offenses he desired and by objecting to the trial court's refusal to use them. Appellant also argues that the trial court erred by admitting irrelevant evidence concerning a shooting in Tennessee and Appellant's gang activity and that the prejudicial effect of such evidence substantially outweighed its probative value.

For the reasons explained below, we conclude that the trial court properly denied Appellant's requested instructions on the lesser included homicide instructions, and that evidence of the Tennessee shooting and Appellant's gang activity was properly admitted.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In April, 2008, police in Clarksville, Tennessee investigated a burglary at a Clarksville home. Among the items stolen was an Xbox 360 video game console. Clarksville police found the Xbox at a local pawn shop where it had been pawned by Shyara Olavarria. When questioned, Olavarria told police that Derrick James had asked her to pawn it for him. James could be seen on pawn shop surveillance footage with Olavarria.

Appellant, James, and Jordan Young were all members of the Nine Trey Bloods gang. According to Appellant, the three

men discussed their belief that something needed to be done about "snitches," i.e., those who cooperate with police. To that end, Appellant called Olavarria and asked her to meet him in a remote area of Christian County, Kentucky, near a bridge commonly known as "Ghost Bridge." Olavarria had been romantically interested in Appellant and was eager to meet with him. She left work early and went to the Ghost Bridge area shortly after midnight.

When Olavarria arrived, James, Young, and Appellant were waiting for her. They had driven there together in a car owned by their friend Sherrika Epps. The evidence established that James and Young shot Olavarria approximately fifteen times, killing her at the scene. Appellant told police that he was sitting in the car when the shooting occurred. Police later recovered ten .40–caliber bullet casings from the scene. Forensic analysis showed that Olavarria had also been shot with .38–caliber bullets that could have been fired from a revolver.

After Olavarria was killed, James, Young, and Appellant returned to Epps's house in Clarksville where they had a brief confrontation with Ojawaine "Juice" Marbury, a member of a rival gang. After Marbury left, Epps drove James, Young, and Appellant home. A short time later, she saw James and Young walking through Clarksville, without Appellant, and she picked them up again.

While Epps and her passengers were stopped at a traffic light, Marbury came up to the vehicle, and began hitting James. Epps testified that James and Young both pulled out guns—James had a revolver and Young had a black semiautomatic pistol. As Marbury's attack on James continued, Young shot Marbury in the chest. The Tennessee Bureau of Investigation determined that the .40–caliber shell casing found at the scene of Marbury's shooting

came from the same weapon as the bullet casings found at Ghost Bridge, the scene of Olavarria's death.

Appellant was arrested by police in Clarksville, where he was interviewed twice by Christian County Sheriffs Deputy Chris Williams. During the interviews Appellant admitted that he had lured Olavarria to the Ghost Bridge area where she was killed. He also admitted to being involved in discussions with James and Young concerning Olvarria's "snitching," and that the possibility of killing her was mentioned. Nevertheless, during the second interview, Appellant also stated that while he knew James and Young were planning to do "something" to Olavarria, he did not know that they planned to kill her.

On August 15, 2008, Appellant was indicted for murder "by shooting Shyara Olavarria thereby causing her death, or by acting as an accomplice thereto." The trial of his case was severed from James's and Young's trials. Appellant was convicted following a jury trial and sentenced to 25 years' imprisonment. He therefore appeals to this Court as a matter of right. Ky. Const. § 110(2)(b).

## II. DENIAL OF JURY INSTRUCTIONS ON LESSER INCLUDED HOMICIDE OFFENSES

The jury in this case was instructed on the crimes of intentional murder by complicity in the slaying of Olavarria and wanton murder by complicity in the slaying of Olavarria. Appellant had tendered proposed jury instructions for accomplice liability on the lesser homicide offenses of first-degree manslaughter, second-degree manslaughter, and reckless homicide, and requested that the jury be so instructed. The trial court declined to instruct on the lesser homicide offenses. Appellant ar-

gues that the trial court's refusal to give the requested instructions was error.

There is no doubt that the Commonwealth's case against Appellant was based upon a theory of complicity in causing a result as described in KRS 502.020(2):

(2) When causing a particular result is an element of an offense, a person who acts with the kind of culpability with respect to the result that is sufficient for the commission of the offense is guilty of that offense when he:

(a) Solicits or engages in a conspiracy with another person to engage in the conduct causing such result; or

(b) Aids, counsels, or attempts to aid another person in planning, or engaging in the conduct causing such result; or

(c) Having a legal duty to prevent the conduct causing the result, fails to make a proper effort to do so.

In the case of homicide, the particular result (and an element of the crime) is a person's death; here, it is the death of Olavarria.[1] To be guilty as an accomplice under KRS 502.020(2), a person must act with respect to that result with the "kind of culpability," meaning the *mens rea,* required for the offense charged, i.e., intent, wantonness, recklessness. For example, to be guilty of intentional murder as an accomplice to the act, the defendant must have intended for the victim to be killed.

Conversely, in a situation where the defendant *did not* intend that the victim be killed, he may only be convicted of the homicide offense that corresponds with his own *mens rea,* such as wantonness, recklessness, or intent to cause serious physical injury, but not death. Those offenses are wanton murder (KRS 507.020(1)(a)), first-degree manslaughter (KRS 507.030), second-degree manslaughter (KRS 507.040), and reckless homicide (KRS 507.050) statutes. *Harper v. Commonwealth,* 43 S.W.3d 261, 267 (Ky.2001) ("It is important to note that under subsection (2) of KRS 502.020, an accomplice's liability and the principal actor's liability can be at different levels, e.g., the accomplice could be found guilty of complicity to reckless homicide even though the homicide was committed wantonly or intentionally by the principal actor."). This principle is further explained in *Tharp v. Commonwealth* as follows:

[A] defendant can be found guilty of complicity to an unintentional homicide under KRS 502.020(2) if there is evidence that he/she either actively participated in the actions of the principal, or failed in a legal duty to prevent those actions, without the intent that those actions would result in the victim's death, but with recklessness, i.e., failure to perceive a substantial and unjustifiable risk that death would result, KRS 501.020(4), supporting a conviction of reckless homicide by complicity, KRS 507.050; wantonness, i.e., an awareness of and conscious disregard of a substantial and unjustifiable risk of that result, KRS 501.020(3), supporting a conviction of manslaughter in the second degree by complicity, KRS 507.040; or aggravated wantonness, i.e., wantonness creating a grave risk of death under circumstances manifesting an extreme indifference to human life, supporting a conviction of wanton murder by complicity, KRS 507.020(1)(b).

40 S.W.3d 356, 361 (Ky.2000) (footnote omitted).

---

1. *See,* e.g., KRS 507.020(1)(a) ("A person is guilty of murder when with intent to cause the death of another person, he causes the death of such person or of a third person ...").

With the above principles in mind, we now turn to the instructions tendered by Appellant, whereby he requested that the jury be given the option of convicting him as an accomplice to first-degree manslaughter, to second-degree manslaughter, or to reckless homicide.

### A. First Degree Manslaughter

■ Under Appellant's tendered first-degree manslaughter instruction, upon application of KRS 507.030,[2] the jury could have convicted him of this crime *only* if it believed that Appellant believed that his accomplices "did not intend to kill Shyrra Olavarria but intended to cause serious physical injury to [her.]" In other words, a conviction under this instruction would have been proper only if the jury determined that Appellant intended that his accomplices assault the victim rather than kill her.

In support of his argument that he was entitled to a first-degree manslaughter instruction, Appellant relies upon two statements he made during his second interview with Deputy Williams. The first statement he cites is his admission that, "I knew something was going to happen to her . . . but I did not know she was going to lose her life . . . it wasn't a life-threatening situation." The second statement relied upon is his assertion, "I didn't know what they [James and Young] was [sic] actually going to do." Thus, in this part of the interview, Appellant admitted to luring Olavarria to the crime scene and that he knew *something* would happen to her, but denied knowing that James and Young were going to kill her.

Upon examination, it is clear that these statements do not suggest that Appellant's mental state was that the "something"—

that is, the result he intended to happen to the victim—would be an assault (i.e., serious physical injury). While Appellant states that he believed that the result would be *something* other than death, he does not specify what he believed that would be. For example, he may have meant by this statement that he believed that James and Young would only scare and threaten Olavarria; or he may have thought the planned punishment would be to rape her, or rob her, and otherwise leave her unharmed. In other words, we can only speculate as to what the "something" was that Appellant intended to occur. The cited statements are simply too ambiguous for an accurate determination of what Appellant meant, and therefore provide no basis to suppose that by "something" Appellant intended for Olavarria to suffer serious physical injury but not death, which is a prerequisite to the first-degree manslaughter instruction.

■ "An instruction on a lesser included offense is required only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that he is guilty of the lesser offense." *Houston v. Commonwealth,* 975 S.W.2d 925, 929 (Ky.1998). Further, by its plain terms, RCr 9.54 imposes a duty on the trial court to instruct the jury on the whole law of the case; that is, "this rule requires instructions applicable to every state of the case deducible from or supported to any extent by the testimony." *Thomas v. Commonwealth,* 170 S.W.3d 343, 349 (Ky. 2005). However, the trial court has no duty to instruct on a theory not supported by the evidence. *Payne v. Commonwealth,* 656 S.W.2d 719, 721 (Ky.1983).

---

**2.** KRS 507.030 provides in relevant part that "(1) A person is guilty of manslaughter in the first degree when: (a) With intent to cause

serious physical injury to another person, he causes the death of such person or of a third person[.]"

Here, the trial court properly denied a second-degree manslaughter instruction. The ambiguous statements of Appellant provided no more than speculative proof for his theory of first-degree manslaughter that was not suggested by any other evidence. As such, no rational juror could have concluded from the statements made in the interview that Appellant intended, exclusively, an assault against the victim.

### B. Second-degree Manslaughter

■ Appellant tendered a second-degree manslaughter instruction based upon KRS 507.040,[3] which provided for his conviction if he conspired with James and Young, and "that in so doing, the Defendant was aware of and consciously disregarded a substantial and unjustifiable risk that Shyarra Olavarria would be killed, and that his disregard of that risk constituted a gross deviation from the standard of care that a reasonable person would have observed in the same situation." He contends that the trial court erred by denying his request for this instruction.

■ We begin by noting that a wanton murder instruction pursuant to KRS 507.020(1)(b) was given by the trial court, and that second-degree manslaughter is a lesser included offense to wanton murder.[4] Thus, the two instructions will often be given in combination. Wanton murder is distinguishable from second-degree manslaughter only in that the former contains the additional element described in the phrase, "under circumstances manifesting extreme indifference to human life." *Berryman v. Commonwealth*, 237 S.W.3d 175, 181 (Ky.2007). For clarity, we may refer to wantonness under circumstances manifesting extreme indifference to human life as "aggravated wantonness," and wantonness without that additional element as "simple wantonness." As further explained below, we conclude that under the facts of this case, a rational jury could not have found Appellant's participation in the crime to be simple wantonness as required for a second-degree manslaughter instruction. Rather, his conduct in luring the victim to the crime scene was so obviously accompanied by the risk that Olavarria would be killed that it necessarily included the element of acting "under circumstances manifesting extreme indifference to human life."

As noted above, Olavarria was of interest to the Nine Trey Bloods gang because she had "snitched" on James about the Clarksville burglary. Thus, Appellant, James, and Young had discussions concerning what to do about her. They specifically discussed killing her. Even if Appellant was not completely certain of what his other two accomplices were about to do, he was nevertheless very much aware that killing her was a real possibility, and, therefore, he knew that a real risk of death was present. Despite this knowledge, he nevertheless exploited the victim's roman-

---

**3.** KRS 507.040 provides that "(1) A person is guilty of manslaughter in the second degree when he wantonly causes the death of another person[.]" KRS 501.020(3) defines wantonly as: "A person acts wantonly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard

of conduct that a reasonable person would observe in the situation...."

**4.** KRS 507.020(1)(b) provides that "A person is guilty of murder when: (b) Including, but not limited to, the operation of a motor vehicle under circumstances manifesting extreme indifference to human life, he wantonly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person."

tic interest in him to lure her into that remote area, late at night, when he knew his two accomplices would be lying in wait—the same two accomplices who were planning retribution against her and who had discussed killing her as part of that plan.

Obviously, Appellant's conduct constituted the disregarding of an obvious, substantial, and unjustifiable risk that the victim would be killed, and is therefore clearly "wanton" so as to implicate a second-degree manslaughter instruction. However, that same conduct must be also characterized as acting "under circumstances manifesting extreme indifference to human life." Indeed, it would be difficult to devise a better example of acting with "extreme indifference to human life" than the conduct engaged in by Appellant. KRS 507.020(1)(b) provides that driving a vehicle under the influence of alcohol may support a jury finding of aggravated wantonness. Compared to driving under the influence, upon reflection, Appellant's conduct was far more likely to result in the taking of a human life, as it predictably did. Accordingly, no reasonable juror could conclude that he likewise engaged in wanton conduct without also finding the aggravating element of acting with "extreme indifference to human life."

As we have explained, an instruction on a lesser included offense is required only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense and yet believe beyond a reasonable doubt that he is guilty of the lesser offense. *Houston*, 975 S.W.2d at 929. Considering the totality of the circumstances—and particularly given Appellant's discussions with his cohorts about killing the victim—it is not reasonably possible that the jury might have a reasonable doubt as to the defendant's guilt of wanton murder, and yet also believe beyond a reasonable doubt that he was guilty of second-degree manslaughter.

## C. Reckless Homicide

Appellant tendered a reckless homicide instruction, pursuant to KRS 507.050,[5] which provided for his conviction if he conspired with James and Young and "that in so doing, the Defendant failed to perceive a substantial and unjustifiable risk that Shyarra Olavarria would be killed, and that his failure to perceive that risk constituted a gross deviation from the standard of care that a reasonable person would have observed in the same situation."

An examination of their respective elements discloses that the difference between second-degree manslaughter and reckless homicide is that under the former, the Defendant recognized the risk and disregarded it, while under the latter he failed to perceive it in the first instance. Therefore, as a lesser included offense, when a second-degree manslaughter instruction is given, a reckless homicide instruction often will be given as well.

Here, however, because the obvious risk of death inherent in taking a "snitch" to meet the criminal "victims" of her "snitching" (particularly, these known criminal gang members) alone, late at night, to a

---

5. KRS 507.050 provides that "(1) A person is guilty of reckless homicide when, with recklessness he causes the death of another person." KRS 501.020(4) defines recklessly as "A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

remote area is so manifestly apparent that the Appellant could not reasonably have "failed to perceive" the "substantial and unjustifiable risk that Shyarra Olavarria would be killed." This is especially so here, where Appellant had comprehensive knowledge of the circumstances and he admitted to hearing discussions of a plan to possibly kill her. Accordingly, we conclude that the trial court did not err in denying Appellant's request for a reckless homicide instruction.

## III. EVIDENCE OF THE MARBURY SHOOTING IN TENNESSEE AND OTHER GANG ACTIVITY

Appellant also argues that the trial court erred by permitting the introduction of evidence relating to the shooting of "Juice" Marbury in Clarksville, Tennessee and of his gang affiliations. Appellant contends that the evidence should have been excluded because it was irrelevant, and/or that its probative value was substantially outweighed by its prejudicial effect.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. All relevant evidence is generally admissible. KRE 402. However, within the sound discretion of the trial judge, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of undue prejudice . . . ." KRE 403.

 The evidence of Marbury's shooting in Tennessee was highly relevant. Appellant did not shoot Olavarria, but was charged with murder under a theory of complicity. In order to convict Appellant, the Commonwealth had to prove that James and Young killed Olavarria. James and Young were identified as being involved in the shooting of Marbury, where police found the bullet casing that matched the casings found at the scene of Olavarria's murder.[6] Thus, the shooting of Marbury tied James and Young to the matching bullet casings and strongly implicated them in the murder of Olavarria in Kentucky.

 In addition, the evidence of Marbury's shooting was not unduly prejudicial to Appellant. Appellant was clearly not involved in that crime. If anything, the evidence of the Tennessee shooting tended to show that Young and James were violent people. Appellant portrayed them as such as part of his trial strategy.

The evidence of gang activity was relevant to explain the context of and the motive for Olavarria's murder. In his recorded interview with police, Appellant stated that he, Young, and James decided that something needed to be done about "snitches." The evidence of gang affiliation was relevant to provide context for the confrontation with Marbury that occurred the same night as Olavarria's murder. The evidence of gang activity and gang affiliation presented at trial was not excessive and was highly probative of motive and intent. While jurors may have negative associations with gang activity, we do not believe the evidence was unfairly prejudicial under the circumstances of this case.

 Appellant specifically objects to the testimony of Officer Jay Skidmore of the Clarksville Police Department. Officer Skidmore testified to his own involvement in the case and also testified as an expert on gangs and gang activity. Officer Skidmore explained the meaning of various

---

6. Marbury survived the shooting. Both he and Epps testified that James and Young were present when Marbury was shot. Marbury identified Young as the one who shot him.

gang terminology, including "triple-9" (a violation such as "snitching," i.e., being an informant), "paw marks" (brands that denote gang membership), "Lord's hell" (total mayhem), and "someone's gonna get got" (a person is going to get what's coming to them). The phrases which Officer Skidmore described were relevant, because most of the phrases were used by Appellant in his recorded interview with Deputy Williams. The interview was played for the jury at trial. Officer Skidmore provided relevant context, and Appellant makes no objection to Skidmore being qualified as an expert witness.

Nor was Officer Skidmore's testimony unduly prejudicial, given that he provided the jury with general information about gang terminology, which was necessary for a full understanding of Appellant's statements to police. Officer Skidmore's testimony was not inflammatory and did not prejudice the jury against Appellant. With respect to the evidence of gang activity and gang terminology, there was no error.

In summary, the evidence concerning the Marbury shooting in Tennessee and Appellant's gang activities was properly admitted.

## IV. CONCLUSION

For the foregoing reasons, the judgment of conviction against Appellant is affirmed.

All sitting. All concur.