# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: FEBRUARY 20, 2020
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

FINAL

2018-SC-000648-MR

DATE 3/12/20
Hutcheson

GREGORY MILLER                                                    APPELLANT

ON APPEAL FROM PULASKI CIRCUIT COURT
V.        HONORABLE JEFFREY THOMAS BURDETTE, JUDGE
CASE NO. 16-CR-00565

COMMONWEALTH OF KENTUCKY                              APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING IN PART, REVERSING IN PART, AND REMANDING

A Pulaski County jury found Gregory Scott Miller guilty of one count of first-degree wanton endangerment of Joshua Godby; one count of first-degree wanton endangerment of Ashley Hunt; and one count of first-degree burglary. For each count of wanton endangerment, Miller received a sentence of five years of imprisonment. For the single burglary charge, Miller received a sentence of twenty years. The sentences were ordered to run consecutively, and Miller therefore received a total sentence of thirty years of imprisonment. This appeal followed as a matter of right. *See* Ky. Const. Section 110(2)(b). Having reviewed the record and the arguments of the parties, we hereby affirm in part

and reverse in part the judgment of the Pulaski Circuit Court and remand for further proceedings consistent with this opinion.

## BACKGROUND

Miller's convictions stem from a confrontation between Miller and Joshua Godby on August 18, 2016. Prior to that incident, Miller and Godby had been friends. The friendship turned sour, however, when Godby had a brief sexual affair with Miller's girlfriend. Godby testified that he "messed around" with Miller's girlfriend "a time or two." Several months to one year[1] prior to the incident in question, Miller confronted Godby about the affair while the two were at Miller's home. During that confrontation, Godby pushed Miller, and Miller retrieved his gun and hit Godby on the arm[2] as Godby was leaving the home. After that confrontation,[3] the two men exchanged text messages in which they "badmouthed" each other. Godby described these as "come on" and "come get it" messages. However, the two did not see each other again until the August 2016 incident.

Miller did, however, appear at the Godby home in April 2016, a few months prior to the incident giving rise to this case, but Godby was not home at the time. On that occasion, Godby's live-in girlfriend, Ashley Hunt, was

---

[1] Godby testified at trial that Miller confronted him about "seven months to a year" prior to the August 2016 incident that gave rise to this case.

[2] It is unclear whether Miller hit Godby's arm with his hand or his gun. It is also unclear what type of gun Miller retrieved.

[3] It is unclear exactly when these text messages were exchanged. Godby testified only that they exchanged the messages "after. . . we got in the fight at his house." He later testified that, at the time of the August 2016 incident, he had not had "any kind of contact" with Miller for "a long time."

2

leaving the house and walking to her car when Miller pulled his car in behind her. He got out of his car and began walking towards her, with a holstered pistol on his side. As Miller walked towards Hunt, he put his hand on the pistol but did not remove it from its holster. He did not threaten Hunt, but Hunt testified that Miller was "very aggressive," and she felt threatened. She asked, "Whoa, what are you doing?" to which Miller replied, "Is Josh home?" Hunt told Miller that she was the only one there, and he eventually left. Shaken, Hunt called the police to file a report. No charges were filed, however. Hunt testified that the officers told her that it would be difficult to press charges because it would be her word against Miller's.

A few months later, in the late afternoon of August 18, 2016, ten-year-old Ben Godby, Joshua Godby's son, was outside his father's house practicing his golf swing. His father was inside the home watching television with Hunt. While Ben was practicing, Gregory Miller pulled up to the house, got out of his car, and approached Ben. Ben testified that, at that time, Miller was "familiar" to him but he "didn't really know his name." Miller carried a 20-gauge shotgun with him, and according to Ben, he "was holding it ready to fire it if he needed to." Miller asked the boy where his father was, and Ben said that his father was in the basement before remembering that he was in his bedroom. Ben was intimidated by the gun but believed that Miller "might have needed to talk to [his dad] for a minute."

Ben led Miller into a screened-in front porch on the house, believing that Miller would wait there while Ben retrieved his father. Ben did not invite Miller

3

into the home, and Miller did not ask if he could enter the home. Nevertheless, Miller walked past Ben, opened the unlocked door, and entered the home. Miller was not sure where Godby's bedroom was, however, so Ben took Miller to his father's room. Ben knocked and told his father that someone was there to talk to him, then moved behind Miller. At this point, Miller knocked loudly and kicked the bedroom door, which was locked. Ben testified that Miller began cursing and yelling at Godby to come out of the bedroom. It is unclear how Miller was holding the shotgun or in what direction it was pointed. Ben testified that, at this point, he ran from the hallway to the kitchen, where he sat down, hiding, unsure what to do.

Godby and Hunt heard Miller say, "Godby, I got you now" and recognized the voice as Miller's. With Miller pounding on the bedroom door, Godby entered a bathroom that was attached to his bedroom. The bathroom also had an entrance in the hallway. Godby exited the bathroom into the hallway, where he saw Miller standing with the shotgun. It is unclear whether Miller was still facing the bedroom door or where he was pointing the gun when Godby exited the adjacent bathroom door, but Godby testified that the gun was not pointed at him. Upon seeing the shotgun, Godby grabbed the barrel of the gun and pushed it up. The gun discharged, shooting straight into the ceiling. Godby wrestled the gun from Miller's hands and threw it aside. He "manhandled" Miller to the floor and hit Miller several times as Miller proclaimed that he "didn't do this" and it was not his gun. Both Godby and Hunt testified that Miller repeatedly exclaimed, "We're friends!"

Meanwhile, prior to the gun being discharged, Ben had come out of his hiding spot in the kitchen and was peeking into the hallway. He saw a flash and heard the gunshot. He testified that he was scared and ran outside the house and across the street to a neighbor's home.

At the time the gun discharged, Hunt was still in the bedroom or bathroom.[4] She then exited through the bathroom into the hallway and saw Miller and Godby struggling over the gun. When Godby took the gun from Miller and tossed it aside, Hunt picked it up. Still carrying the gun, she called 911 as she walked around the house looking for Ben. Unsure of where he was, she walked out of the front door of the house to look for him. Her neighbor then informed her that Ben was safe, and Hunt reentered the home. She returned to the hallway, where Godby still had Miller on the ground. Hunt testified that, at some point, she considered shooting Miller but chose instead to hit Miller twice with the gun. Godby and Hunt kept Miller subdued until police officers arrived.

A jury trial took place on August 14 and 15, 2018. The jury convicted Miller of one count of first-degree wanton endangerment in relation to Joshua Godby, one count of first-degree wanton endangerment in relation to Ashley Hunt, and one count of first-degree burglary. He was sentenced to a total of thirty years of imprisonment, and this appeal followed as a matter of right.

---

[4] It is unclear from Hunt's testimony whether she had entered the bathroom by the time the gun discharged.

## ANALYSIS

Miller asserts the following errors on appeal: (1) the trial court erred in denying his motions for directed verdict on all counts; (2) the trial court abused its discretion in allowing testimony about a prior bad act in violation of KRE 404(b); and (3) the trial court erred in declining to instruct the jury on the lesser-included offenses of second-degree wanton endangerment and criminal trespass. For the reasons set forth below, we hold that the trial court erred in denying Miller's motion for a directed verdict on the count of first-degree wanton endangerment of Ashley Hunt. We further hold that the trial court erred in declining to instruct the jury on the lesser-included offense of second-degree wanton endangerment of Joshua Godby. Lastly, we hold that the trial court erred in allowing the Commonwealth to introduce the contested KRE 404(b) evidence, but this error was harmless and does not warrant reversal of the remaining charge, burglary. In sum, we reverse the first-degree wanton endangerment convictions of both Ashley Hunt and Joshua Godby, but affirm the first-degree burglary conviction. We address each of these charges in turn.

### I. First-degree wanton endangerment of Ashley Hunt

We first address Miller's conviction for first-degree wanton endangerment of Godby's live-in girlfriend, Ashley Hunt. We begin with Miller's argument that the trial court should have granted his motion for directed verdict on this charge. In reviewing the trial court's ruling on this issue, we are mindful of the following:

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the

6

> Commonwealth. If the evidence is sufficient to induce a reasonable
> juror to believe beyond a reasonable doubt that the defendant is
> guilty, a directed verdict should not be given. For the purpose of
> ruling on the motion, the trial court must assume that the
> evidence for the Commonwealth is true, but reserving to the jury
> questions as to the credibility and weight to be given to such
> testimony.

*Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991). Simply put, "there must be evidence of substance, and the trial court is expressly authorized to direct a verdict for the defendant if the prosecution produces no more than a mere scintilla of evidence." *Id.* (citing *Commonwealth v. Sawhill*, 660 S.W.2d 3, 5 (Ky. 1983)). Thus, so long as the Commonwealth produces more than a mere scintilla of evidence to support the charges, a defendant's motion for directed verdict should be denied. When an appellate court reviews the trial court's decision to deny a motion for directed verdict, that court must consider whether, "under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt" because "only then the defendant is entitled to a directed verdict of acquittal." *Id.* (citing *Sawhill*, 660 S.W.2d at 5).

Under Kentucky Revised Statute ("KRS") 508.060(1), "[a] person is guilty of wanton endangerment in the first degree when, under circumstances manifesting extreme indifference to the value of human life, he wantonly engages in conduct which creates a substantial danger of death or serious physical injury to another person." For purposes of the Kentucky Penal Code, "[a] person acts 'wantonly' with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that

7

the circumstance exists." KRS 501.020(3). Furthermore, "[t]he risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation." *Id.*

Miller argues that the trial court should have granted his motion for directed verdict on the charge of first-degree wanton endangerment of Hunt because she was not in the hallway at the time the gun discharged, the gun was never pointed at her, and she was not in close proximity to the gun when it discharged. Thus, he argues, no reasonable juror could conclude that Hunt was exposed to conduct creating a substantial danger of death or serious physical injury.

On this point, we find *Swan v. Commonwealth,* 384 S.W.3d 77 (Ky. 2012) to be instructive. In *Swan,* two armed men entered a home and ordered its occupants into the living room. Several of the home's occupants gathered in the living room, but one woman, Ms. Lumpkins, stayed in a back bedroom and hid under the bed. Meanwhile, in the living room, the intruders shot two of the home's occupants, fired one shot into the ceiling, and fired one shot into the fireplace. Both men were convicted of multiple charges, including several charges of first-degree wanton endangerment.

On appeal, we considered whether the trial court properly denied one defendant's motion for a directed verdict on the wanton endangerment charges. We noted that "[f]iring a weapon in the immediate vicinity of others is the prototype of first degree wanton endangerment. This would include the firing of

8

weapons into occupied vehicles or buildings." *Id.* at 102 (quoting Robert G. Lawson & William H. Fortune, *Kentucky Criminal Law* § 9–4(b)(2), at 388 n.142 (1998)) (internal quotation marks omitted). "Thus," we explained, "the proof of [the defendants] firing their guns near the victims assembled in the living room was ample proof to support the first-degree convictions related to those victims." *Id.* at 102–03.

However, as to Ms. Lumpkins, we noted that "[n]o evidence showed that a bullet was fired in Ms. Lumpkins's direction or that [the defendant] pointed a gun at her. And unlike the victims in the front room, Ms. Lumpkins was not present when [the defendant] and his confederate were waving their guns around haphazardly and making threats." *Id.* at 103. Thus, we explained that "[e]ven when viewing the evidence in a light most favorable to the Commonwealth, it is difficult to conceive of an actual danger of death or serious physical injury to which Ms. Lumpkins was exposed." *Id.* Furthermore, while we acknowledged that bullets may ricochet, we concluded that "[t]he self-evident danger of ricocheting bullets must have limits." *Id.* Accordingly, we held that the trial court should have granted the defendant's motion for directed verdict on the charge of first-degree wanton endangerment of Ms. Lumpkins.

In the present case, Hunt's position at the time the gun discharged was more like Ms. Lumpkins's position than the other victims' positions in *Swan*. The evidence indicates that Hunt was in the bedroom or bathroom at the time the gun discharged; she was not in the hallway. There is no evidence that the gun was pointed toward either room. Furthermore, the gun was discharged

9

into the ceiling of the hallway. While we acknowledge that a bullet may ricochet and hit someone outside of its initial trajectory, we are also mindful of our earlier statement that "[t]he self-evident danger of ricocheting bullets must have limits." *Id.* In this case, the evidence does not indicate that Hunt was in such close proximity to be endangered by the threat of a ricochet. In sum, Hunt was not in the immediate vicinity of the gun at the time it discharged, nor was there any evidence presented that her location in the bedroom or bathroom put her at risk of any injury or danger from the firing of the gun.

Under these specific circumstances, we hold that no reasonable juror could conclude that Hunt was exposed to conduct creating a substantial danger of death or serious physical injury. Accordingly, the trial court erred in denying Miller's motion for directed verdict on the charge of first-degree wanton endangerment of Hunt. We must therefore reverse and vacate the judgment of the circuit court regarding count three of the indictment, first-degree wanton endangerment of Ashley Hunt.

## II. First-degree wanton endangerment of Joshua Godby

Having reversed the conviction for first-degree wanton endangerment of Hunt, we turn to Miller's conviction for first-degree wanton endangerment of Godby. We first note that the Commonwealth produced sufficient evidence to survive a motion for a directed verdict on the charge of first-degree wanton endangerment of Godby, and therefore, the trial court did not err in denying that motion. However, we need not discuss that analysis in detail, as we hold that the first-degree wanton endangerment conviction of Godby must be

10

reversed for failure to provide a jury instruction on the lesser-included offense of second-degree wanton endangerment.

At the close of evidence, Miller requested instructions on the lesser-included offenses of second-degree wanton endangerment and criminal trespass. However, the trial court denied the request, finding that there was sufficient evidence to prove the charged offenses and that Miller had not put on any evidence that would require lesser-included instructions. For the following reasons, we find that the trial court erred in declining to provide the requested instruction on second-degree wanton endangerment.[5]

We have previously explained, "It is always the duty of a trial court to instruct a jury on lesser included offenses when it is so requested and it is justified by the evidence." *Martin v. Commonwealth*, 571 S.W.2d 613, 615 (Ky. 1978). We have also emphasized that a defendant "'is entitled to an instruction on any lawful defense which he has,' including instructions on lesser included offenses." *Allen v. Commonwealth*, 338 S.W.3d 252, 255 (Ky. 2011) (quoting *Hudson v. Commonwealth*, 202 S.W.3d 17, 20 (Ky. 2006)).

More recently, we clarified that "[a]n instruction on a lesser included offense is required only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that he is guilty of the lesser offense." *Hudson v. Commonwealth*, 385 S.W.3d 411, 416 (Ky. 2012)

---

[5] We address the criminal trespass instruction below.

11

(quoting *Houston v. Commonwealth*, 975 S.W.2d 925, 929 (Ky. 1998)) (internal quotation marks omitted). Thus, on appeal, the reviewing court asks "whether a reasonable juror could acquit of the greater charge but convict of the lesser." *Allen*, 338 S.W.3d at 255 (citations omitted). In doing so, the reviewing court should "consider[] the evidence favorably to the proponent of the instruction." *Id.* (citations omitted).

In this case, the trial court concluded that lesser-included instructions were unnecessary because Miller had failed to put on any evidence to support those lesser-included offenses and there was sufficient evidence to prove the charged offenses of first-degree wanton endangerment and burglary. On this point, we note that the burden to prove the elements of the charged offenses rests with the Commonwealth. *See* KRS 500.070(1). The defendant is not required to put on evidence to disprove any element of an offense in order to receive an instruction on a lesser-included offense. Therefore, the trial court improperly considered this point when ruling on the instruction request.

Furthermore, the trial court did not consider whether a reasonable juror could acquit on the greater charges and convict on the lesser, and instead considered only whether a reasonable juror could possibly convict on the greater charges.[6] It appears, then, that the trial court improperly applied the

---

[6] The trial court recited the rule that "[a]n instruction on a lesser included offense is required only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that he is guilty of the lesser offense." *Hudson*, 385 S.W.3d at 416 (quoting *Houston*, 975 S.W.2d at 929) (internal citation marks omitted). However, the trial court did not perform that analysis.

12

standard for considering a motion for directed verdict, rather than a request for lesser-included instructions. *See Benham*, 816 S.W.2d at 187 ("If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given.").

Accordingly, we now turn to Miller's conviction for first-degree wanton endangerment of Godby and ask "whether a reasonable juror could acquit of the greater charge[s] but convict of the lesser." *Allen*, 338 S.W.3d at 255 (citations omitted). Having reviewed the evidence as a whole and construing that evidence favorably to Miller, we conclude that a reasonable juror could have acquitted Miller of the charge of first-degree wanton endangerment of Godby but convicted on the lesser included offense of second-degree wanton endangerment.

As stated above, first-degree wanton endangerment requires that a person, "under circumstances manifesting extreme indifference to the value of human life, . . .wantonly engage[] in conduct which creates a substantial danger of death or serious physical injury to another person." KRS 508.060(1). The lesser-included offense of second-degree wanton endangerment requires only that a person "wantonly engage[] in conduct which creates a substantial danger of physical injury to another person."[7] KRS 508.070(1). We have previously explained,

---

[7] Second-degree wanton endangerment is a lesser-included offense of first-degree wanton endangerment. *See Combs v. Commonwealth*, 652 S.W.2d 859, 860 (Ky. 1983).

13

> The differences between first- and second-degree wanton endangerment are the mental state and degree of danger created. As to the mental state, both crimes require wanton behavior, but first-degree also requires "circumstances manifesting extreme indifference to the value of human life," which has been described as "aggravated wantoness." As to the danger created, first-degree requires a substantial danger of death or serious physical injury, whereas second-degree requires only a substantial danger of physical injury.

*Swan*, 384 S.W.3d at 102 (internal citations omitted). Thus, if a jury believed that Miller wantonly engaged in conduct creating a substantial danger of physical injury but held reasonable doubts about whether he did so under circumstances manifesting extreme indifference to the value of human life or whether he created a substantial danger of death or physical injury, the jury could acquit Miller of first-degree wanton endangerment but convict him of second-degree wanton endangerment as to Joshua Godby.

Based on the evidence in this case, a reasonable juror could conclude that Miller acted wantonly and created a substantial risk of physical injury toward Godby. For purposes of the Kentucky Penal Code, "[a] person acts 'wantonly' with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists." KRS 501.020(3). In this case, a jury could reasonably conclude that Miller acted wantonly in carrying a loaded shotgun into Godby's home, "holding it ready to fire if he needed to." Godby testified that Miller was not invited to Godby's home and Godby was not expecting him. The evidence also indicates that Miller and Godby were no longer on friendly terms. A

14

reasonable juror could conclude that Miller was aware of and consciously disregarded the risk that a confrontation could occur and that the gun could discharge, creating a substantial danger of physical injury to another person.

A reasonable juror could conclude, however, that while Miller acted wantonly, he did not create a substantial danger of death or serious physical injury, as required for first-degree wanton endangerment. Importantly, there is no evidence in this case that Miller pointed the gun at anyone. This distinguishes this case from prior precedent holding that "the pointing of a gun, whether loaded or unloaded (provided there is reason to believe the gun may be loaded) at any person constitutes conduct that 'creates a substantial danger of death or serious physical injury to another person' in violation of KRS 508.060." *Key v. Commonwealth*, 840 S.W.2d 827, 829 (Ky. App. 1992); *see also Commonwealth v. Clemons*, 734 S.W.2d 459 (Ky. 1987) (holding that the pointing of a gun at another person is sufficient to satisfy wanton endangerment charge), *Thomas v. Commonwealth*, 567 S.W.2d 299 (Ky. 1978) (same).

Furthermore, in this case, it is not clear how the gun discharged, but a reasonable juror could conclude that it discharged as a result of the struggle between Miller and Godby and not because Miller pulled the trigger. For example, Godby testified that he was not sure how the gun discharged but acknowledged that it could have happened during the struggle. In addition, the gun was not pointed in the direction of any person and instead discharged into the ceiling. In other words, a reasonable juror could believe that the firing of

15

the shotgun was accidental. This, in turn, distinguishes the present matter from other cases in which the defendants were found guilty of first-degree wanton endangerment after intentionally firing shots into crowds or towards other people. *See Smith v. Commonwealth*, 410 S.W.3d 160, 166 (Ky. 2013); *Port v. Commonwealth*, 906 S.W.2d 327, 334 (Ky. 1995); *Combs*, 652 S.W.2d at 860–61.

With these same facts in mind, a reasonable juror could also decide that Miller did not act wantonly "under circumstances manifesting extreme indifference to the value of human life," as required by KRS 508.060(1). Again, it is not clear how the gun discharged, but a reasonable juror could conclude that it accidentally discharged during the struggle. On this point, we note the difference between carrying a loaded shotgun into another person's home and intentionally firing a shotgun in that person's occupied home. We believe the latter could demonstrate "extreme indifference to the value of human life," while the former does not necessarily indicate this particular mental state. For example, in *Swan*, we noted that aimlessly firing a gun in public would constitute second-degree wanton endangerment, while firing a gun in the immediate vicinity of others demonstrates a level of wantonness sufficient to satisfy first-degree wanton endangerment. *See* 384 S.W.3d at 102. In both scenarios, however, the gun is intentionally fired, while in the present case, a reasonable juror could conclude that the gun was accidentally discharged during the struggle. Thus, a reasonable juror could examine the evidence in

16

this case and determine that Miller acted wantonly but not "under circumstances manifesting extreme indifference to the value of human life."

Having considered the totality of the evidence in this case, we conclude that a reasonable juror could have acquitted of the greater charges of first-degree wanton endangerment but convicted Miller of second-degree wanton endangerment as to Godby. Accordingly, the trial court erred in declining to instruct the jury on the lesser-included offense. This constitutes reversible error, and we must therefore reverse the judgment of the trial court as it relates to the count of first-degree wanton endangerment of Joshua Godby. *See Oakes v. Commonwealth*, 320 S.W.3d 50, 58 (Ky. 2010) (explaining that "[t]he failure to grant a request for a lesser-included offense instruction is reversible error"); *Commonwealth v. Swift*, 237 S.W.3d 193, 196 (Ky. 2007) (explaining that "the trial court's failure to give a necessary lesser-included offense instruction cannot be deemed a harmless error" (citing *Webb v. Commonwealth*, 904 S.W.2d 226, 229 (Ky. 1995))).

## III.   First-Degree Burglary

Having concluded that we must reverse Miller's convictions for first-degree wanton endangerment of both Hunt and Godby, we next address Miller's remaining conviction for first-degree burglary. As we discuss below, we first conclude that the trial court did not err in denying Miller's motion for directed verdict on this charge. We also hold that the trial court did not err in denying Miller's request for an instruction on the lesser-included offense of criminal trespass. Because the burglary conviction survives those two

17

arguments, we also consider Miller's KRE 404(b) argument. For the reasons set forth below, we conclude that the trial court erred in admitting inappropriate "bad acts" evidence under KRE 404(b), but that this error was harmless. We therefore affirm Miller's conviction for first-degree burglary.

### A. The trial court did not err in denying Miller's motion for directed verdict.

We first consider whether, "under the evidence as a whole, it would [have been] clearly unreasonable for a jury to find guilt" on the charge of first-degree burglary, in which case Miller would have been entitled to a directed verdict of acquittal. *Benham*, 816 S.W.2d at 187.

Under KRS 511.020(1)(a), "[a] person is guilty of burglary in the first degree when, with the intent to commit a crime, he knowingly enters or remains unlawfully in a building, and when in effecting entry or while in the building or in the immediate flight therefrom, he or another participant in the crime . . . [i]s armed with explosives or a deadly weapon." Miller argues that a directed verdict should have been granted on this charge because the Commonwealth presented insufficient evidence to prove that Miller knew it was unlawful for him to enter or remain in Godby's home or, if he entered lawfully, that his lawful presence was terminated, and that Miller intended to commit a crime once he was inside the house.

On the question of whether he knew it was unlawful to enter or remain in the home, Miller points to the fact that Miller had visited Godby's home approximately ten times in the past and had met Ben a couple of times. Ben did not tell Miller to stay on the porch or to get out of the house, and he even

18

guided Miller to his father's bedroom. We note, however, other facts suggesting that Godby entered the home unlawfully. For example, Godby testified that he was not expecting Miller, had not invited him to the home, and had not spoken to him in several months, other than exchanging some heated text messages a few months prior. When Miller approached Ben, he carried a shotgun and held it in both hands as though he were ready to fire it. Ben, who was only ten years old at the time of the incident, testified that he felt intimidated by the gun. Ben also testified that he expected Miller to stay on the front porch, but Miller walked past him, opened the front door, and walked into the home. Furthermore, Ben testified that Miller walked into the home but could not locate the bedroom; only then did Ben lead him to his father's room. This suggests that, if Miller had known where the bedroom was, he would have gone there himself, without permission.

On this point, we believe the unpublished case of *Higareda v. Commonwealth*, No. 2008-SC-000384-MR, 2009 WL 1451919 (Ky. May 21, 2009) is persuasive. In that case, Higareda knocked on the door of the victim's home, and the victim's minor sibling opened the door. Higareda asked for the victim, and the young boy said that the victim was sleeping in his bedroom. Without permission from the child, Higareda entered the home and, with a gun sticking out of his pocket, proceeded to the victim's bedroom, where he threatened the victim with the gun. We held that this evidence was sufficient to overcome Higareda's motion for directed verdict. In doing so, we relied on a published Court of Appeals' opinion, *Fletcher v. Commonwealth*, 59 S.W.3d 920

19

(Ky. App. 2001), in which that court similarly upheld the denial of a motion for directed verdict of a burglary charge. In that case, the court noted that the victim, who had answered the door when the defendant knocked, did not make "any kind of utterance, gesture or movement that could reasonably constitute an invitation, either explicit or implicit, to [the defendant] to enter the home." Similarly, in the present case, there is no evidence that Ben invited Miller into the home, either expressly or implicitly by gesture or movement. As the facts recited above demonstrate, a juror could reasonably find that Miller was not an invited or welcome guest. Thus, we conclude that the Commonwealth presented sufficient evidence to convince a reasonable juror that Miller knowingly entered the home unlawfully.

We also conclude that the Commonwealth presented sufficient evidence for a reasonable juror to conclude that Miller intended to commit a crime when he unlawfully entered the home. For example, there was evidence that Miller carried a firearm into the house. This was not a holstered pistol or other small firearm that one might carry on them at all times. Rather, it was a loaded shotgun, and Ben testified that Miller carried it with both hands, as though he were ready to fire it. While still carrying the gun, Miller kicked and knocked loudly on Godby's bedroom door, saying "I got you now." He cursed and yelled for Godby to come out of the bedroom. There was also evidence that Miller and Godby had a falling out about a year prior over Godby's affair with Miller's girlfriend. Miller and Godby had not seen each other since that falling out, and Godby had not invited Miller over, nor was he expecting him at his home. From

20

this evidence, a reasonable juror could conclude that Miller entered the home with the intent to commit a crime, namely, to threaten or harm Godby.

In sum, we conclude that the Commonwealth presented sufficient evidence to cause a reasonable juror to find beyond a reasonable doubt that Miller was guilty of first-degree burglary. Therefore, the trial court did not err in denying Miller's motion for a directed verdict on this charge.

## B. The trial court did not err in denying Miller's request for a criminal trespass instruction.

We next consider whether the trial court erred in denying Miller's request for a jury instruction on the lesser-included offense of criminal trespass. In other words, we ask "whether a reasonable juror could acquit of the greater charge but convict of the lesser." *Allen*, 338 S.W.3d at 255 (citations omitted). In doing so, we "consider[] the evidence favorably to the proponent of the instruction." *Id.* (citations omitted).

As noted above, first-degree burglary requires one to knowingly enter or remain unlawfully in a building with the intent to commit a crime, "and when in effecting entry or while in the building or in the immediate flight therefrom, he . . . [i]s armed with explosives or a deadly weapon." KRS 511.020(1). The lesser-included offense of criminal trespass differs from first-degree burglary in that it requires only that one "knowingly enters or remains unlawfully in a dwelling."[8] KRS 511.060(1). Thus, if a jury believed that Miller knowingly

---

[8] Criminal trespass is a lesser-included offense of first-degree burglary. *See Hunt v. Commonwealth*, 304 S.W.3d 15, 30 (Ky. 2009).

21

entered or remained unlawfully in Godby's home, but the jurors held a reasonable doubt about whether he did so with the intent to commit a crime, the jury could acquit Miller of first-degree burglary but convict him of criminal trespass.

Under the facts of the present case, however, a jury could not reasonably conclude that Miller knowingly entered the home unlawfully *without* the intent to commit a crime. We refer back to many of the facts previously mentioned: Godby and Miller had not spoken in several months, and their last interactions had been less than friendly. Miller had not been invited to Godby's home and Godby was not expecting him. Miller did not receive express permission to enter the house from Ben, nor is there any evidence suggesting that Ben implicitly invited Miller into the home, either by gesture or comment. Rather, he approached the home with a loaded shotgun, which he held as though he were ready to shoot it. He entered the home uninvited while wielding the shotgun, approached Godby's bedroom door, knocked loudly and kicked the door, and yelled "I got you now." Ben also testified that Miller "told [Godby] to come out" and was cursing. Even viewing these facts in Miller's favor, we hold that a reasonable juror could not conclude that Miller knowingly entered the home unlawfully but did not do so with the intent to commit a crime. In other words, a jury could not interpret the evidence and reasonably conclude that Miller committed criminal trespass, rather than burglary.

Having considered the totality of the evidence in this case, we conclude that a reasonable juror could not have acquitted of the greater charge of

22

burglary but convicted Miller of criminal trespass. Accordingly, the trial court did not err in declining to instruct the jury on the lesser-included offense.

### C. The trial court erred in admitting evidence of the April 2016 incident, but the admission of such evidence was harmless error.

Miller also argues that the trial court abused its discretion in allowing the Commonwealth to elicit testimony about an April 2016 incident in which Miller approached Hunt with a gun. Defense counsel was first notified about the Commonwealth's intent to elicit such testimony on the first morning of trial. Defense counsel sought a continuance due to the lack of notice under Kentucky Rule of Evidence ("KRE") 404(c). The Commonwealth argued that similar testimony had arisen during the preliminary hearing, thereby satisfying the notice requirement. The prosecutor also argued that the testimony fell outside the scope of KRE 404(b) because Miller's carrying of a gun during the incident was not illegal and therefore was not a "bad act" under the rule. The trial court overruled the motion for a continuance, found that defense counsel had sufficient notice, and allowed the Commonwealth to elicit testimony about the April 2016 incident.

During the Commonwealth's case-in-chief, Godby testified that he knew of an incident occurring between Miller and Hunt in April 2016. However, he testified that he was not there, and the prosecutor did not pursue that line of questioning further. Defense counsel did not object. During Godby's cross-examination, defense counsel elicited testimony about the April 2016 incident.

23

Godby ultimately said that he was not present for the incident and defense counsel would have to ask Hunt about the details.

Later, Hunt testified for the Commonwealth and began to discuss details about the April 2016 incident. Defense counsel objected "on the same grounds." His objection was overruled, and Hunt continued her testimony. She testified that, in April 2016, she was leaving the house and walking to her car when Miller pulled his car in behind her. He got out of his car and began walking towards her, with a holstered pistol on his side. As Miller walked towards Hunt, he put his hand on the pistol but did not remove it from its holster.[9] He did not threaten Hunt, but Hunt testified that Miller was "very aggressive" and she felt threatened. She asked, "Whoa, what are you doing?" to which Miller replied, "Is Josh home?" Hunt told Miller that she was the only one there, and he eventually left. Shaken, Hunt called the police to file a report. No charges were filed, however. Hunt testified that the officers told her that it would be difficult to press charges because it would be her word against Miller's.

Miller now argues that the testimony should have been excluded under KRE 404(b). More specifically, Miller argues that the trial court abused its discretion in permitting this testimony, in failing to limit the prejudice of the evidence (e.g., by limiting the extent of the testimony or providing a limiting

---

[9] During Godby's testimony about this incident, he mentioned Miller "waving" the pistol but also stated that he was not present at the incident and only knew the details he had heard from Hunt. During Hunt's testimony, however, she clarified that Miller never removed the pistol from its holster.

admonition), and in declining to continue the trial for lack of notice under KRE 404(c). For the reasons set forth below, we hold that the trial court erred in admitting evidence of the April 2016 incident, but this error was harmless.

Under KRE 404(b), "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Such evidence may be admissible, however, "[i]f offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." KRE 404(b)(1). It may also be admissible if it is "so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party." KRE 404(b)(2). However, if the Commonwealth intends to introduce such evidence in its case-in-chief, "it shall give reasonable pretrial notice to the defendant of its intention to offer such evidence." KRE 404(c).

On appeal, we review the trial court's decision to admit such evidence for an abuse of discretion. *Harp v. Commonwealth*, 266 S.W.3d 813, 822 (Ky. 2008). In doing so, we are mindful that KRE 404(b) is an exclusionary rule, and "any exceptions to the general rule that evidence of prior bad acts is inadmissible should be 'closely watched and strictly enforced because of [its] dangerous quality and prejudicial consequences.'" *Huddleston v. Commonwealth*, 542 S.W.3d 237, 243 (Ky. 2018) (quoting *Clark v. Commonwealth*, 223 S.W.3d 90, 96 (Ky. 2007)); *see also Bell v. Commonwealth*, 875 S.W.2d 882, 889 (Ky. 1994) (explaining that "trial courts must apply [KRE

25

404(b)] cautiously, with an eye towards eliminating evidence which is relevant only as proof of an accused's propensity to commit a certain type of crime").

As a threshold matter, we must address the Commonwealth's contention that the April 2016 incident is not a bad act under KRE 404(b). The Commonwealth argues to this Court that the carrying of a gun is not illegal and is therefore not a bad act. However, under the plain language of the rule, KRE 404(b) applies to "[o]ther crimes, wrongs, or acts."[10] Thus, the prior act need not be a *criminal* act to fall within the scope of KRE 404(b). In this case, the mere possession of a personal firearm is not the bad act; rather, the bad act is approaching Hunt in a threatening or aggressive manner, with his hand on his pistol.

Because the Commonwealth intended to introduce evidence of this prior bad act, it was required to provide reasonable notice under KRE 404(c). Under that provision, if the Commonwealth intends to introduce such evidence in its case-in-chief, "it shall give reasonable pretrial notice to the defendant of its intention to offer such evidence." KRE 404(c). If the Commonwealth fails to give such notice, the court may exclude the evidence "or for good cause shown may excuse the failure to give such notice and grant the defendant a continuance or such other remedy as is necessary to avoid unfair prejudice caused by such failure." *Id.* However, in this case, the Commonwealth did not notify defense

---

[10] We acknowledge that KRE 404(b) references "other crimes, wrongs, or acts"; it does not use the phrase "bad acts." However, Kentucky courts repeatedly refer to such acts as "bad acts."

counsel of its intent to elicit testimony about the April 2016 incident until the first day of trial. Defense counsel sought a continuance due to the lack of notice, but the Commonwealth argued that similar testimony had arisen during the preliminary hearing, thereby satisfying the notice requirement. The trial court overruled the motion for a continuance and found that defense counsel had sufficient notice. We disagree.

We have previously stated that the purpose of the KRE 404(c)'s notice requirement "is to provide the accused with an opportunity to challenge the admissibility of this evidence through a motion *in limine* and to deal with reliability and prejudice problems at trial." *Bowling v Commonwealth*, 942 S.W.2d 293, 300 (Ky. 1997), (quoting Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 2.25 (3rd Ed.1993) (internal quotation marks omitted)), *overruled on other grounds by McQueen v. Commonwealth*, 339 S.W.3d 441 (Ky. 2011). Furthermore, "where the accused has received 'actual notice' of the intention to introduce KRE 404(b) evidence and the accused has suffered no prejudice, the notice requirement in KRE 404(c) is satisfied." *Matthews v. Commonwealth*, 163 S.W.3d 11, 19 (Ky. 2005) (citations omitted).

In this case, the trial court ruled that defense counsel had prior notice through the preliminary hearing. However, defense counsel argued that the officer who testified at the preliminary hearing had only vaguely referenced an earlier incident; it was unclear whether the officer was referencing the same incident; and Hunt never testified about the incident during the preliminary hearing. Furthermore, though when arguing this issue to the trial court, the

27

Commonwealth referenced a document (but not a police report) that details the April 2016 incident, it apparently did not provide this document in discovery. Accordingly, from the facts available in the record, we must conclude that defense counsel did *not* have actual notice of the Commonwealth's intention to introduce the KRE 404(b) evidence at trial. Instead, the Commonwealth announced its intent to introduce the evidence on the first day of trial, and defense counsel was forced to challenge the admissibility of that evidence on the spot. No excuse was provided for the failure to properly notify defense counsel. For these reasons, we hold that the trial court erred in finding that timely notice had been provided under KRE 404(c) and in failing to continue the trial or provide "such other remedy . . . to avoid unfair prejudice" as provided in KRE 404(c).

Even if timely notice had been provided in this case, we note that the prior bad act evidence would be admissible only if relevant for some purpose other than to prove Miller's criminal disposition and, even then, only if its probative value outweighed any undue prejudice. *See Bell*, 875 S.W.2d at 889–91. Having reviewed the record and arguments of counsel, we conclude that evidence of the April 2016 incident was not relevant for any other purpose than to prove Miller's criminal disposition, and, as such, should not have been admitted under KRE 404(b).

At trial, the Commonwealth only argued that the April 2016 incident was not evidence of a bad act. Before this Court, the Commonwealth makes the same argument. It also argues that evidence of the April 2016 incident, in

which Miller showed up to the Godby home with a gun, is relevant because it made it more probable that Miller showed up to the house in August 2016 with a gun. This is important, the Commonwealth argues, because the defense repeatedly implied that Godby and Hunt were lying about the August 2016 shooting incident.

However, this is exactly the type of propensity evidence that KRE 404 prohibits. We have previously explained, "The purpose of KRE 404(b) 'is to prohibit unfair inferences against a defendant' by excluding 'evidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith.'" *Conrad v. Commonwealth,* 534 S.W.3d 779, 781 (Ky. 2017) (quoting *Anderson v. Commonwealth,* 231 S.W.3d 117, 120 (Ky. 2007); KRE 404(b)). Here, the Commonwealth only argues that the evidence was relevant to show that because Miller had previously appeared at Godby's house with a gun, it is more likely that he did that same act again on August 18, 2016. In other words, the relevance of this evidence is to show that Miller acted in conformity with his prior bad behavior. This is improper character evidence.

The Commonwealth did not contest defense counsel's assertion that identity was not at issue in the case, and there was no dispute that Miller and Godby knew each other prior to August 2016. Even if we were to view this as an argument that the April 2016 incident was relevant to show Miller's plan or

29

intent,[11] as referenced in KRE 404(b)(1), the facts available in the record do not support either theory. In April 2016, Miller brought a holstered handgun to Godby's home and never removed it from its holster. He asked if Godby was there, and left after being told that Godby was not home. Approximately four months passed without incident. Then, in August 2016, Miller arrived at Godby's home with a shotgun, which he held as though he were ready to fire it, and asked where Godby was before proceeding into the home. At trial, the Commonwealth conceded that it was not using the April 2016 incident to prove that the same gun was used in both incidents. Thus, the facts surrounding the April 2016 incident are not similar enough to the facts of the August 2016 shooting to demonstrate plan or intent. Under these circumstances, we cannot say that the April 2016 incident demonstrates Miller's plan or intent to return nearly four months later with a shotgun to confront Godby, nor we can say it is relevant for any other legitimate purpose. Furthermore, we reiterate that the Commonwealth did not present this argument to the trial court or this Court.

As the Commonwealth admits, the April 2016 incident tended to show that Miller acted in conformity with that prior bad behavior when he arrived at the Godby home with a gun in August 2016. Based on the limited facts available to us in the record, we cannot say it was relevant for any other

---

[11] The Commonwealth did not present this argument to the trial court or this Court. However, this Court may affirm a trial court's ruling for any reason supported by the record, even if not argued by the parties. *See Fischer v. Fischer*, 197 S.W.3d 98, 103 (Ky. 2006). Thus, we consider these additional arguments, and though we ultimately find them unconvincing, we felt compelled to discuss them in this opinion.

legitimate purpose, nor was it inextricably intertwined with other evidence essential to the case. Rather, it was evidence of a prior bad act, used to show action in conformity with that prior bad act. Accordingly, we hold that the trial court abused its discretion in permitting testimony about the April 2016 incident.

The above referenced error was preserved by defense counsel's repeated objections.[12] However, we find that error to be harmless. "A preserved, non-constitutional error is harmless 'if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *Crossland v. Commonwealth*, 291 S.W.3d 223, 233 (Ky. 2009) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). However, "[t]he inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Id.* (quoting *Kotteakos*, 328 U.S. at 765) (internal quotation marks omitted). With this standard in mind, we have repeatedly found the erroneous admission of a prior bad act to be harmless when the other evidence of guilt is significant or overwhelming. *See, e.g., Baumia v. Commonwealth*, 402

---

[12] Though defense counsel did not object to Godby's brief testimony about the April 2016 incident, he did object to Hunt's testimony about that incident. We also note that the Commonwealth does not argue this issue was unpreserved.

S.W.3d 530, 544 (Ky. 2013); *King v. Commonwealth*, 276 S.W.3d 270, 275–76 (Ky. 2009); *Taylor v. Commonwealth*, 276 S.W.3d 800, 811 (Ky. 2008).

In the present case, the jury heard testimony about the initial confrontation between Miller and Godby, during which Miller retrieved a gun. They also heard about the heated "come get it" messages that the two men exchanged. Ben testified as to how Miller approached the Godby home in August 2016, carrying a loaded shotgun as though he were ready to fire it and walking past Ben into the home, without an explicit or implicit invitation. The jury also heard from Godby that Miller was uninvited and unwanted in the home. When Miller entered the home, he pounded on and kicked Godby's bedroom door. He yelled at Godby to come out, cursed, and stated "I got you now." Simply put, the evidence that Miller knowingly entered the home unlawfully and with the intent to commit a crime (i.e., threaten or harm Godby) was overwhelming. Furthermore, the Commonwealth did not discuss the April 2016 incident during its closing argument, or in other words, did not emphasize that incident to the jury. Given the substantial evidence against Miller, we do not believe that the jury's verdict would have changed if the evidence had not been admitted or if Miller had sufficient notice and adequate time to prepare to challenge the testimony at trial. Under these circumstances, we cannot say that the testimony about the April 2016 incident substantially influenced the outcome of Miller's case. Accordingly, though this "bad acts" evidence was improperly admitted, this error was harmless and does not warrant reversal.

Finding no reversible error, we hereby affirm Miller's conviction for first-degree burglary.

## CONCLUSION

For the reasons set forth above, we hereby reverse in part and affirm in part the judgment of the Pulaski Circuit Court. We remand this matter to the Pulaski Circuit Court to vacate the judgment on count three of the indictment and for further proceedings consistent with this opinion.

Minton, C.J.; Hughes, Keller, Nickell, VanMeter and Wright, JJ., sitting. All concur. Lambert, J., not sitting.

COUNSEL FOR APPELLANT:

Shannon Renee Dupree
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky